**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RAY LEON;
RICHARD INZA;
MICHAEL INZA;
individually and on behalf of themselves and
all others similarly situated;
*Plaintiffs*,
v.
AT&T, INC.;
AT&T CORPORATION;
AT&T SERVICES, INC.;
SCOTT T. FORD;
GLENN H. HUTCHINS;
WILLIAM E. KENNARD;
STEPHEN J. LUCZO;
MARISSA A. MAYER;
DAVID R. MCATEE II;
MICHAEL B. MCCALLISTER;
BETH E. MOONEY;
MATTHEW K. ROSE;
JOHN STANKEY;
CYNTHIA B. TAYLOR;
LUIS A. UBIÑAS;

T-MOBILE USA, INC.;
ANDRÉ ALMEIDA;
MARCELO CLAURE;
SRIKANT M. DATAR;
SRINIVASAN GOPALAN;
TIMOTHEUS HÖTTGES;
DR. CHRISTIAN P. ILLEK;
JAMES J. KAVANAUGH;
RAPHAEL KÜBLER;
THORSTEN LANGHEIM;
DOMINIQUE LEROY;
LETITIA A. LONG;
MARK NELSON;
MIKE SIEVERT;
TERESA A. TAYLOR;
KELVIN R. WESTBROOK;

DEUTSCHE TELEKOM AG;
TIMOTHEUS HÖTTGES;
DR. FERRI ABOLHASSAN;
BIRGIT BOHLE;
SRINI GOPALAN;

CIVIL ACTION NO. _____

JURY TRIAL DEMANDED

CHRISTIAN P. ILLEK;
THORSTEN LANGHEIM;
DOMINIQUE LEROY;
CLAUDIA NEMAT;

VERIZON COMMUNICATIONS, INC.;
CELLCO PARTNERSHIP dba VERIZON
WIRELESS;
VERIZON SERVICES, CORP.;
VERIZON BUSINESS NETWORK
SERVICES, INC.;
VITTORIO COLAO;
SHELLYE L. ARCHAMBEAU;
MARK T. BERTOLIN;
ROXANNE S. AUSTIN;
MELANIE L. HEALEY;
LAXMAN NARASIMHAN;
CLARENCE OTIS, JR.;
DANIEL H. SCHULMAN;
RODNEY E. SLATER;
CAROL B. TOMÉ;
VANDANA VENKATESH
HANS VESTBERG;
GREGORY G. WEAVER;

*Defendants*.

## COMPLAINT-CLASS ACTION

# TABLE OF CONTENTS

**COMPLAINT-CLASS ACTION** ................................................................................ **2**

**TABLE OF CONTENTS** ........................................................................................ **3**

**PREAMBLE** ........................................................................................................ **6**

**INTRODUCTION** ............................................................................................... **6**

    A.   TECHNICAL FEASIBILITY OF STANDALONE WI-FI CALLING ................................... 12
    B.   REFUTING DEFENDANTS' CLAIMS TECHNICAL INFEASIBILITY OF STANDALONE WI-FI CALLING AND TEXTING SERVICES ................................................................ 14
    C.   BUSINESS FEASIBILITY OF STANDALONE WI-FI CALLING .................................... 14
    D.   WI-FI CALLING BUSINESS FEASIBILITY AND ANTITRUST CONCERNS ..................... 15
    E.   TECHNICAL FEASIBILITY OF STANDALONE MOBILE DATA ................................... 16
    F.   REFUTING DEFENDANTS' CLAIMS TECHNICAL INFEASIBILITY OF STANDALONE MOBILE DATA SERVICES ........................................................................................ 16
    G.   MOBILE DATA BUSINESS FEASIBILITY AND ANTITRUST CONCERNS ..................... 17
    H.   BOTH WI-FI CALLING AND MOBILE DATA STANDALONE SERVICES MUST BE PROVIDED - SUBSCRIBERS ARE BEING GOUGED! ................................................................ 18

**UNIFIED ANALYSIS: DRAWING PARALLELS BETWEEN THE GOOGLE ANTITRUST DECISION AND THE VOIP-PAL ANTITRUST COMPLAINT** ..... **19**

    A.   INTRODUCTION ................................................................................... 19
    B.   ENHANCED COMPARISON TO GOOGLE LLC ANTITRUST DECISION ..................... 21

**STATEMENT OF GRIEVANCES** .......................................................................... **23**

    A.   KEY ISSUES ........................................................................................ 25
    B.   LEGAL AND MORAL IMPERATIVES ......................................................... 25

**DEFENDANTS' BUNDLING PRACTICES AND ANTITRUST VIOLATIONS** ............... **26**

    A.   BUNDLE 1: CELLULAR CALLING AND TEXTING TIED TO WI-FI CALLING ........................ 26
    B.   BUNDLE 2: CELLULAR CALLING AND TEXTING TIED TO MOBILE DATA ........................ 27
    C.   BUNDLING ANTITRUST VIOLATIONS .......................................................... 27
    D.   THE DEFENDANTS' MVNO ACQUISITIONS IN THEIR QUEST TO EXPAND THEIR MARKET DOMINANCE ........................................................................................ 30
    E.   RELEVANT APPELLATE AND SUPREME COURT PRECEDENTS DIRECTLY SUPPORT THESE CLAIMS ............................................................................................ 32

**DEFENDANTS FRAUDULENT MISREPRESENTATION, DECEIT, AND MISLEADING CONDUCT** ............................................................................. **34**

    A.   FRAUDULENT MISREPRESENTATION ......................................................... 34
    B.   DECEITFUL CONDUCT ........................................................................... 35
    C.   MISLEADING CONDUCT ......................................................................... 35
    D.   LEGAL PRECEDENTS AND APPLICATIONS .................................................. 36

**INDICATIONS OF CARTEL BEHAVIOR IN THE DEFENDANTS' COORDINATED PRACTICES AND MARKET IMPACT** ................................................................. 36

   A.  UNAUTHORIZED USE OF TECHNOLOGY AND KNOW-HOW EXPOSES CARTEL CONDUCT ..... 36
   B.  ANTICOMPETITIVE AND ANTICONSUMER PRACTICES .......................................... 37
   C.  MARKET IMPLICATIONS OF DEFENDANTS' ANTICOMPETITIVE AND ANTICONSUMER PRACTICES ................................................................................................ 38
   D.  IMPACT OF DEFENDANTS' ANTICOMPETITIVE AND ANTICONSUMER PRACTICES ............... 39
   E.  SPECIFIC IMPACT OF DEFENDANTS' ANTICOMPETITIVE AND ANTICONSUMER PRACTICES ON THE CLASS ................................................................................................ 39
   F.  WEIGHING THE EVIDENCE ......................................................................... 40
   G.  ANTITRUST VIOLATIONS ............................................................................ 40

**THE PARTIES** ........................................................................................... 41

   A.  THE PLAINTIFFS ...................................................................................... 41
   B.  THE AT&T DEFENDANTS ......................................................................... 41
   C.  THE T-MOBILE DEFENDANTS ................................................................... 43
   D.  THE VERIZON DEFENDANTS ..................................................................... 44

**JURISDICTION AND VENUE** ................................................................... 46

**VENUE SUITABILITY AND REQUEST FOR CONSOLIDATION** ................. 47

   A.  VENUE SUITABILITY ................................................................................ 47
   B.  REQUEST FOR CONSOLIDATION ................................................................ 49
   C.  RELATED VOIP-PAL.COM ANTITRUST ACTION ........................................ 51

**STATEMENT OF THE CASE** ................................................................... 60

   A.  LEGAL PRECEDENTS ................................................................................ 61
   B.  FTC AND DOJ POSITIONS ....................................................................... 62

**HIGH BAR OF TWOMBLY** ..................................................................... 62

   A.  FACTUAL PLEADINGS ............................................................................... 62
   B.  PRECEDENT CASES SUPPORTING PLAINTIFFS' FACTUAL PLEADINGS ................... 64
   C.  MEETING THE HIGH BAR OF TWOMBLY ................................................... 64

**STANDING FOR THE CLASS AS PER ARTICLE III AND THE FEDERAL ANTITRUST LAWS OF THE SHERMAN AND CLAYTON ACTS** ..................... 65

   A.  STANDING OF THE CLASS UNDER ARTICLE III ............................................. 65
   B.  FEDERAL STANDING OF THE CLASS ........................................................... 65

**ARBITRATION CLAUSE IN SUBSCRIBER AGREEMENTS IS UNENFORCEABLE** . 66

   A.  INVALIDATION OF ARBITRATION CLAUSES ................................................. 66
   B.  RELEVANT COURT RULINGS ..................................................................... 67

**CLASS ACTION ALLEGATIONS AND CERTIFICATION** ......................... 68

   A.  CERTIFICATION CRITERIA WITH DIRECT LEGAL SUPPORT ............................. 68
   B.  CLASS DEFINITION AND LINK TO PRECEDENTS ........................................... 69

C.   REQUEST FOR CERTIFICATION AND JUDICIAL ACTION ....................................... 69
D.   INCLUSION OF DEUTSCHE TELEKOM AG IN ANTITRUST COMPLAINTS: A NECESSARY
COMPONENT ................................................................................................... 69

**PIERCING THE CORPORATE VEIL AND DIRECTORS' LIABILITY** ........................ **71**

A.   ANTICOMPETITIVE CONDUCT AND FRAUDULENT MISREPRESENTATION ........................... 71
B.   JUSTIFICATION FOR PIERCING THE CORPORATE VEIL ................................................. 72
C.   PRECEDENT CASES ....................................................................................... 72
D.   WEIGHING THE EVIDENCE ................................................................................. 73

**COMPARATIVE ANALYSIS: UNITED STATES V. GOOGLE LLC AND UNITED
STATES V. MICROSOFT CORP, AND THE COUNTS** ......................................... **73**

A.   OVERVIEW OF CASES ...................................................................................... 73
B.   COMPARATIVE ANALYSIS ................................................................................. 74
C.   WEIGHING THE EVIDENCE ................................................................................. 76

**THE COUNTS** ................................................................................................. **78**

A.   COUNT I: MONOPOLIZATION AND ATTEMPTS TO MONOPOLIZE (SHERMAN ACT §2) ....... 79
B.   COUNT II: TACIT COLLUSION (CLAYTON ACT §7) .................................................. 79
C.   COUNT III: RESTRAINT OF TRADE (SHERMAN ACT §1) ........................................... 80
D.   COUNT IV: TYING (CLAYTON ACT §3) ............................................................... 80
E.   COUNT V: FORCED SALE (CLAYTON ACT §3) ...................................................... 80
F.   COUNT VI: PRICE FIXING (CLAYTON ACT §2) ...................................................... 81
G.   COUNT VII: PREDATORY PRICING (CLAYTON ACT §2) ........................................... 81
H.   WEIGHING THE EVIDENCE ................................................................................. 82
I.   COMPARATIVE ANALYSIS OF SEVEN COUNTS: THIS ANTITRUST CLASS ACTION, THE
GOOGLE CASE, AND THE MICROSOFT CASE ............................................................ 82

**DEMAND FOR JURY TRIAL** ............................................................................. **85**

**PROPOSED CLASS RESTITUTION PLAN** ......................................................... **85**

A.   RESTITUTION PROPOSAL OVERVIEW ...................................................................... 85
B.   NATIONWIDE IMPACT AND JUSTIFICATION ................................................................ 87
C.   LEGAL AND ECONOMIC RATIONALE ...................................................................... 88
D.   ENSURING FAIR RESTITUTION AND MARKET STABILITY ............................................... 88
E.   COMPARISON TO LANDMARK CASES FOR THE ANTITRUST CLASS ACTION ....................... 89
F.   A CALL FOR A LANDMARK JUDGMENT .................................................................. 89

**PRAYER FOR RELIEF** ..................................................................................... **90**

**CLOSING** ....................................................................................................... **95**

**PREAMBLE**

1.   AT&T, Verizon, T-Mobile, and Deutsche Telekom (Deutsche Telekom is the majority shareholder of T-Mobile US) (the "Defendants") have systematically violated antitrust laws for over six years by deliberately withholding standalone Wi-Fi calling and mobile data services. Their anticompetitive practices—including tying arrangements, forced sales, and predatory pricing—have allowed them to maintain oligopolistic control over 97% of the U.S. smartphone mobile market. This deliberate conduct has definitively harmed the **General Subscribers Class** encompassing approximately 373 million major carrier subscribers.

2.   The General Subscribers Class, represented by Ray Leon (AT&T), Richard Inza (Verizon), and Michael Inza (T-Mobile), have suffered from barriers to entry, restraint of trade, monopolistic practices, and fraudulent misrepresentation. The Defendants' unauthorized use of a competitor's patented technology has exacerbated these antitrust violations, actively suppressing competition in the telecommunications industry.

3.   The Defendants have implemented a comprehensive anticompetitive bundling strategy by tying Wi-Fi calling and mobile data services to cellular calling and texting services. This practice has effectively prevented the emergence of standalone Wi-Fi calling and mobile data markets, despite the clear technical feasibility of offering such services separately. Their bundling strategy serves to maintain the Defendants' market power and inflated pricing structures, violating Section 1 of the Sherman Act (unreasonable restraint of trade) and Section 3 of the Clayton Act (exclusive dealing and tying).

**INTRODUCTION**

4.   This Class Action Antitrust case is unprecedented, with evidence of antitrust violations by AT&T,

Verizon, T-Mobile, and Deutsche Telekom being not only compelling but overwhelming. These Defendants, who control a staggering 373 million major carrier subscribers and 97% of the U.S. mobile market, have systematically violated antitrust laws by refusing to unbundle Wi-Fi calling and mobile data services from their cellular offerings, thereby maintaining an unlawful stranglehold on the market.

5.    The significance of this case is underscored by its strong parallels to landmark antitrust cases, such as *United States v. Google LLC* and *United States v. Microsoft Corp*. However, this case extends beyond those precedents, involving violations of both Sherman Act Sections 1 and 2, and Clayton Act Sections 2, 3, and 7 by all four Defendants. The breadth and severity of these violations reveal a calculated effort to monopolize the market and suppress competition far beyond what was seen in the *Google* and *Microsoft* cases.

6.    The Plaintiffs will demonstrate that the Defendants' strategy of bundling Wi-Fi calling and mobile data services with cellular services is an egregious violation of antitrust laws. This practice not only mirrors but magnifies the anticompetitive behaviors condemned in the *Google* and *Microsoft* cases, as it builds a monopolistic barrier that stifles innovation, inflates consumer costs, and obliterates potential market entry for competitors.

7.    By filing this case in the District of Columbia, the same jurisdiction that delivered pivotal rulings in the *Microsoft* and *Google* cases, the Plaintiffs seeks to compel the Court to once again champion consumer rights and fair competition. The Defendants' conduct offers the Court a unique opportunity to redefine corporate accountability in an era where digital and telecommunications monopolies threaten to undermine the very principles of free market competition.

1.  **Comparative Analysis: Defendants' Antitrust Violations Aligned with Five Landmark Precedent Cases**

8.  The anticompetitive practices of the Defendants demonstrate a comprehensive and systematic violation of antitrust laws, which not only mirror but extend beyond the breaches identified in five landmark precedent cases. Below is a detailed comparison of these practices against each precedent case, highlighting the Defendants' violations and their alignment with the unlawful conduct condemned in these rulings.

9.  This Class Action Antitrust case is strongly supported by precedent antitrust cases, including:

    a)  **United States v. Microsoft Corp.** (2001).

        1.  **Court**: U.S. Court of Appeals, D.C. Circuit.

        2.  **Exclusionary Dealings and Agreements:** Just as Microsoft was found guilty of using exclusionary practices to maintain its monopoly by tying its web browser to the Windows operating system, the Defendants have engaged in similar exclusionary dealings by bundling Wi-Fi calling and mobile data services with cellular services. This violates **Sherman Act Section 1** and **Clayton Act Section 3**, as these actions unreasonably restrain trade and limit competition.

        3.  **Monopolistic Practices:** The Defendants' conduct parallels Microsoft's monopolistic control over the PC operating systems market, with the Defendants using their dominant position to suppress competition and maintain market control, violating **Sherman Act Section 2**.

    b)  **United States v. Google LLC** (2020, ongoing).

        1.  **Court**: U.S. District Court, District of Columbia.

2. **Collusive Behavior:** The collusion between the Defendants to not offer standalone services echoes Google's exclusionary agreements in the search and search advertising markets, violating **Sherman Act Section 1** and **Clayton Act Section 7**. This case highlights how modern tech giants can maintain market dominance through concerted efforts, similar to the Defendants' coordinated refusal to unbundle services.

3. **Tying Arrangements:** Like Google's exclusionary practices, the Defendants' tying arrangements force consumers into bundled services, violating **Sherman Act Section 1** and **Clayton Act Section 3**.

   *c)* **Northern Pacific Railway Co. v. United States** (1958).

   1. **Court**: U.S. Supreme Court.

   2. **Tying Arrangements**: This Supreme Court ruling established that tying arrangements are per se illegal under **Sherman Act Section 1**. The Defendants' bundling of Wi-Fi calling and mobile data with cellular services is directly comparable, as it limits consumer choice and stifles competition, echoing the unlawful tying condemned in this case.

   3. **Forced Sales**: The Defendants' forced sales tactics, where consumers are compelled to purchase bundled services, also reflect the anti-competitive behavior identified in the Northern Pacific Railway case, violating **Sherman Act Section 1** and **Clayton Act Section 3**.

   *d)* **Eastman Kodak Co. v. Image Technical Services, Inc.** (1992).

   1. **Court**: U.S. Supreme Court.

2. **Exclusionary Dealings and Forced Sales:** The Supreme Court in this case ruled that Kodak's tying of replacement parts to its repair services was anticompetitive, even without initial monopoly power. Similarly, the Defendants' exclusionary dealings and forced sales practices harm competition and restrict consumer choice, violating **Sherman Act Section 1** and **Clayton Act Section 3**.

3. **Predatory Pricing:** The Defendants' use of predatory pricing to eliminate potential competition mirrors Kodak's restrictive practices, violating **Sherman Act Section 2** and **Clayton Act Section 2 (Robinson-Patman Act)**.

e) **United States v. Apple Inc.** (e-books case) (2013).

1. **Court**: U.S. Court of Appeals, Second Circuit.

2. **Collusive Behavior:** Apple was found guilty of conspiring with publishers to raise e-book prices, a form of collusive behavior. The Defendants' collusion to suppress standalone services reflects a similar violation of **Sherman Act Section 1** and **Clayton Act Section 7**.

3. **Monopolistic Practices:** The collusion and resultant monopolistic practices seen in the Apple case are paralleled by the Defendants' actions, which seek to preserve their oligopoly and suppress competition, violating **Sherman Act Section 2**.

### 2. An Urgent Call for Judicial Intervention

10. The Plaintiffs will demonstrate throughout the pleading the Defendants' anticompetitive practices, including exclusionary dealings, collusive behavior, monopolistic practices, tying

arrangements, forced sales, predatory pricing, and the impacts of recent mergers and acquisitions, not only replicate but exceed the breaches identified in these five precedent cases.

11.     This landmark case transcends mere legal precedent, igniting a seismic shift in the balance of power between corporate titans and consumers. Its impact is staggering, with millions of American subscribers poised for immediate change, while a colossal 7.4 billion people worldwide await the aftershocks. The potential for affordable standalone Wi-Fi calling could revolutionize global communication, bridging divides and democratizing connectivity on an unprecedented scale. This isn't just a courtroom battle; it's a watershed moment that could redefine how nearly every person on Earth connects and communicates, marking a pivotal chapter in the annals of consumer rights and corporate accountability.

| GLOBAL MOBILE PHONE SUBSCRBERS BY COUNTRY (in millions) | | | | | | | |
|---------|-------------|---------|-------------|---------|-------------|---------|-------------|
| Country | Subscribers | Country | Subscribers | Country | Subscribers | Country | Subscribers |
| China | 1781 | Turkey | 91 | Ukraine | 65 | Nepal | 44 |
| India | 1150 | Egypt | 90 | Kenya | 63 | Sri Lanka | 43 |
| United States | 362 | Germany | 89 | Saudi Arabia | 60 | Ghana | 42 |
| Indonesia | 345 | Thailand | 88 | Myanmar | 57 | Australia | 41 |
| Brazil | 236 | France | 87 | Poland | 56 | Romania | 40 |
| Russia | 229 | South Korea | 84 | Malaysia | 55 | Uganda | 39 |
| Japan | 193 | Iran | 83 | Canada | 54 | Venezuela | 38 |
| Nigeria | 186 | United Kingdo | 81 | Morocco | 52 | Ethiopia | 37 |
| Pakistan | 178 | Italy | 85 | Iraq | 51 | Chile | 36 |
| Bangladesh | 165 | South Africa | 81 | Algeria | 48 | Kazakhstan | 35 |
| Mexico | 126 | Argentina | 79 | Sudan | 47 | Zambia | 34 |
| Vietnam | 123 | Spain | 74 | Uzbekistan | 46 | | |
| Philippines | 120 | Colombia | 68 | Peru | 45 | | |
| Total Global Subscribers | | | | | | 7.4 Billion | |

**Source: GSMA Intelligence, International Telecommunication Union (ITU)**

12.     These anticompetitive practices are clearly demonstrated as parallel dealings to the five precedent cases, where court decisions have consistently condemned such behavior. The Court now faces an unprecedented opportunity to address these violations by holding the Defendants accountable

under the Sherman and Clayton Acts. By doing so, the Court can restore balance to the telecommunications market, protect consumer rights, and set a global precedent for antitrust enforcement in the digital age. The Defendants' actions must be met with a decisive ruling that not only rectifies the specific harms in this case but also deters future anticompetitive behavior, ensuring that even the largest corporations adhere to the principles of fair competition.

### A.  Technical Feasibility of Standalone Wi-Fi Calling

13.     The Defendants have engaged in a calculated scheme to deprive consumers of choice by forcing them to purchase unnecessary cellular services to access Wi-Fi calling. This predatory bundling strategy constitutes an illegal tying arrangement, flagrantly violating antitrust laws. Despite Wi-Fi calling being technologically independent of cellular services, the Defendants have cynically presented it as a "feature" of their plans, masking its potential as a standalone, cost-effective service. This deception allows them to maintain inflated prices while creating an illusion of added value. In reality, the primary beneficiaries are the Defendants themselves, who use Wi-Fi calling to offload network traffic and improve coverage without incurring additional infrastructure costs.

14.     This anti-competitive behavior not only harms consumers through artificially high prices but also stifles long-term innovation in the telecommunications industry. By suppressing the market for standalone Wi-Fi calling services, the Defendants are actively hindering the evolution of more diverse, flexible, and cost-effective communication solutions. Their actions represent a clear strategy to limit consumer choice, maintain market dominance, and protect outdated business models at all costs. Swift judicial intervention is necessary to halt these practices, restore genuine competition, and safeguard consumer interests in the telecommunications market.

15.     There are no technical barriers preventing the Defendants from offering Wi-Fi calling and texting as a standalone service separate from cellular calling and texting. This practice has effectively

prevented the emergence of standalone Wi-Fi calling and mobile data markets, despite the technical feasibility of such services. The bundling strategy served to maintain the Defendants' market power and pricing structures violating Section 1 of the Sherman Act and Section 3 and 7 of the Clayton Act.

16.    **Protocol Independence**: Wi-Fi calling uses Voice over Internet Protocol (VoIP) technology, operating independently of cellular network protocols.

17.    **Infrastructure Autonomy**: Core network elements for Wi-Fi calling function separately from cellular infrastructure, allowing standalone operation.

18.    **Device-Level Implementation**: Smartphones have distinct components for Wi-Fi communications and cellular communications, enabling Wi-Fi calling and texting without cellular connectivity – a practice encouraged during international travel.

19.    **Network Agnosticism**: Wi-Fi calling operates on any IP network, independent of specific carrier networks, as evidenced by its use during international travel.

20.    **Over-the-Top (OTT) Precedent**: Existing OTT VoIP applications and softphone implementations conclusively prove the viability of standalone Wi-Fi calling.

21.    **Regulatory Compliance**: E911 services for Wi-Fi calling can be provided without relying on cellular location services, addressing key regulatory requirements.

22.    The preponderance of evidence unequivocally supports the technical feasibility of offering Wi-Fi calling as a standalone service. Every critical component of Wi-Fi calling, from network protocols to device implementation, functions independently of cellular systems. The Defendants' bundling of Wi-Fi calling with cellular services is thus a deliberate strategy to maintain market control, not a technical necessity.

### B. Refuting Defendants' Claims Technical Infeasibility of Standalone Wi-Fi Calling and Texting Services

23.    The Defendants consciously chose to keep Wi-Fi calling tied to cellular and texting services, understanding that separating these offerings could disrupt their current pricing structure. By maintaining the bundle, they effectively discouraged subscribers from choosing a standalone Wi-Fi calling service, which would have been available at a much lower cost.

24.    **Existing VoIP Services**: Companies like Google Voice, Skype, TextNow, and WhatsApp already offer standalone calling and texting services that operate over Wi-Fi, proving its technical feasibility.

25.    **Technical Capability of Defendants**: AT&T, Verizon, T-Mobile, and Deutsche Telekom possess superior telecommunications infrastructure and are currently able to support Wi-Fi calling when cellular service is unavailable.

26.    **Antitrust Implications**: The Defendants' bundling practices clearly violate Section 1 of the Sherman Act, which prohibits contracts, combinations, or conspiracies in restraint of trade. By tying Wi-Fi calling to cellular services, they engage in anticompetitive behavior designed to maintain their oligopolistic control over 97% of the U.S. smartphone mobile market.

27.    **Profit Motivation**: The Defendants' refusal to offer standalone Wi-Fi calling services protects their bundled sales and profits. This profit-driven strategy comes at the expense of consumer choice and affordability, particularly harming lower-income consumers who could benefit from more flexible, cost-effective options.

### C. Business Feasibility of Standalone Wi-Fi Calling

28.    The Defendants strategically integrated Wi-Fi calling and texting with cellular calling and texting services, fully aware that offering Wi-Fi calling as a standalone service would undermine their

business model. By bundling these services, they sought to maintain higher subscription rates and prevent subscribers from opting for a more cost-effective, standalone Wi-Fi calling option.

29. **Protecting Core Revenue**: Standalone Wi-Fi calling would cannibalize profits from traditional voice and texting plans.

30. **Maintaining ARPU**: Bundling ensures customers continue paying for expensive full-service packages.

31. **Preventing Competition**: Limiting standalone services inhibits potential competitors specializing in Wi-Fi calling.

32. **Resisting Commoditization**: Bundling preserves carriers' market power and brand value.

33. These practices prioritize profit maximization over providing customers with flexible, affordable options, effectively limiting consumer choice to maintain current business models and revenue streams.

### D.  Wi-Fi Calling Business Feasibility and Antitrust Concerns

34. The Defendants maintained their service bundles, combining Wi-Fi calling and texting with cellular calling and texting, as a strategic decision to safeguard their revenue streams. The Defendants were fully aware that offering Wi-Fi calling separately would lead to a potential exodus of subscribers from the more expensive bundled services.

35. Illegal tying arrangement (Sherman Act, Section 1).

36. Attempt to monopolize (Sherman Act, Section 2).

37. Exclusive dealing (Clayton Act, Section 3).

38. Creation of barriers to entry for potential competitors.

39. This practice leverages market power in cellular services to control the Wi-Fi calling market, limiting consumer choice and stifling innovation. The bundling strategy lacks pro-competitive

justification and constitutes an unfair method of competition (FTC Act, Section 5).

### E.  Technical Feasibility of Standalone Mobile Data

40.  The Defendants implemented an anticompetitive bundling strategy by tying mobile data to cellular calling and texting services. This practice effectively prevented the emergence of a standalone mobile data market, despite the technical feasibility of offering such a service. The bundling strategy served to maintain the Defendants' market power and pricing structures, violating Section 1 of the Sherman Act and Section 3 of the Clayton Act.

41.  Major carriers face no technical barriers in offering standalone mobile data services:

42.  **Network Architecture**: 4G LTE and 5G networks are IP-based, separating voice, text, and data traffic.

43.  **VoLTE and IMS**: Voice calls are now data transmissions over LTE or 5G networks.

44.  **Existing Precedents**: a) Data-only plans for tablets and IoT devices, b) MVNO offerings of data-centric plans, and c) International data-only roaming packages.

45.  **Enabling Technologies**: a) eSIM for flexible service provisioning, b) 5G network slicing for dedicated data-only services, and c) SDN and NFV for versatile service configurations.

46.  These factors conclusively demonstrate the technical and operational feasibility of providing standalone mobile data services, separate from cellular calling and texting.

### F.  Refuting Defendants' Claims Technical Infeasibility of Standalone Mobile Data Services

47.  Through the integration of mobile data with cellular calling and texting services, the Defendants engaged in exclusionary conduct that foreclosed potential competition in the mobile data market. The Defendants outright refusal to offer standalone services has the effect of deterring millions of subscribers from opting for a more cost-effective mobile data solution that could have been

17

offered, thereby maintaining the Defendants' monopoly power in violation of Section 2 of the Sherman Act.

48.   **Technical Feasibility**: Numerous companies already offer standalone mobile data services. AT&T, Verizon, T-Mobile, and Deutsche Telekom possess superior infrastructure, demonstrating clear capability. Existing data-only services for tablets and hotspots prove technical feasibility for smartphones.

49.   **Business Motivations for Bundling**: Higher revenue per user through bundled services. Reduced competition and customer churn. Maintenance of profit from legacy voice and SMS services. Control over communication channels and user data.

50.   **Impact on Consumers**: Limited choice and affordability. Particularly harms lower-income consumers and data-centric users. Prevents use of mobile data as primary internet connection in areas with limited broadband.

51.   The Defendants' refusal to offer standalone mobile data is clearly a business strategy to maintain market control and profitability, not a technical limitation. This practice prioritizes carrier interests over consumer benefits and market competition.

### G.  Mobile Data Business Feasibility and Antitrust Concerns

52.   The Defendants leveraged their dominant position in the cellular service market to control the emerging mobile data technology. By bundling mobile data with traditional cellular services, they effectively stifled the development of a separate mobile data market. This conduct raises significant antitrust concerns under both the Sherman and Clayton Acts, as it may substantially lessen competition and tend to create a monopoly in the evolving telecommunications landscape.

53.   Illegal tying arrangement (Sherman Act, Section 1).

54.   Attempt to monopolize (Sherman Act, Section 2).

**55.**   Exclusive dealing (Clayton Act, Section 3).

**56.**    Unfair methods of competition (FTC Act, Section 5).

**57.**   Bundling practices by dominant mobile carriers create significant barriers to entry for potential data-only service providers, effectively limiting consumer choice, especially for users who primarily rely on mobile data. By forcing consumers into full-service packages that include services they may not need, these practices stifle innovation in the mobile data sector, discouraging the development of specialized, data-centric solutions that could better meet consumer demands. Moreover, such bundling allows carriers to engage in price discrimination and cross-subsidization, which can further entrench their market power, reduce competition, and restrict the availability of more affordable and tailored service options for consumers.

**58.**   This practice leverages carriers' dominance in voice services to control the mobile data market, lacking pro-competitive justification and violating antitrust laws' intent to promote consumer welfare and fair competition.

### H.  Both Wi-Fi Calling and Mobile Data Standalone Services Must Be Provided - Subscribers Are Being Gouged!

**59.**   The Defendants strategically integrated Wi-Fi calling and mobile data with cellular calling and texting services, fully aware that offering these services separately would undermine their business model. By bundling, they sought to maintain higher subscription rates and prevent subscribers from opting for more cost-effective, standalone options.

**60.**   The Defendants consciously chose to keep Wi-Fi calling and mobile data tied to cellular and texting services, understanding that separating these offerings could disrupt their current pricing structure. By maintaining the bundle, they effectively discouraged subscribers from choosing standalone services, which would have been available at a lower cost.

61.    The Defendants' refusal to offer standalone Wi-Fi calling and mobile data services constitutes clear antitrust violations:

**Sherman Act Violations:**

62.    **Section 1**: Tying arrangements forcing bundled purchases

63.    **Section 2**: Monopolization of Wi-Fi calling and mobile data markets

**Clayton Act Violations:**

64.    **Section 3**: Exclusive dealing arrangements lessening competition

65.    Bundling practices in the mobile services industry result in inflated prices, reducing affordability and flexibility for consumers, particularly harming lower-income individuals who are less able to bear the cost. These practices limit consumer choice by forcing customers to purchase comprehensive packages rather than selecting services that meet their specific needs. Additionally, such bundling stifles innovation and prevents new competitors from entering the market, thereby reducing the overall dynamism and competitiveness of the telecommunications sector.

66.    The Defendants' actions are purely profit-driven, prioritizing corporate gains over consumer welfare and technological progress. Their 97% market control allows them to artificially maintain high prices and restrict options.

67.    The Court must compel the Defendants to offer standalone Wi-Fi calling and mobile data services to restore fair competition and protect consumer interests in the telecommunications market.

## UNIFIED ANALYSIS: DRAWING PARALLELS BETWEEN THE GOOGLE ANTITRUST DECISION AND THE VOIP-PAL ANTITRUST COMPLAINT

### A.  Introduction

68.    In both the ongoing United States v. Google LLC antitrust case and the Antitrust Class Action

complaint, defining the relevant market is central to understanding the alleged anticompetitive practices. Market definition plays a crucial role in determining the scope of monopolistic behavior and the potential harm to competition and consumers.

69.   In the Google case, the relevant market has been defined as the online search and search advertising markets. Google's dominance in these markets, through its extensive control over search engine results and the advertising ecosystem, is at the heart of the U.S. government's case. The argument is that Google has maintained and extended its monopoly by engaging in exclusionary practices, effectively stifling competition and harming consumers.

70.   Similarly, in the Antitrust Class Action complaint, the relevant markets include Wi-Fi calling services, mobile data services, and their bundling with cellular calling and texting for smartphone subscribers. The complaint alleges that major telecommunications providers, including AT&T, Verizon, T-Mobile, and Deutsche Telekom, have conspired to monopolize these markets by bundling Wi-Fi calling and mobile data services with traditional cellular calling and texting, thereby preventing the emergence of standalone services and stifling competition. The case also highlights the providers' use of exclusionary practices and predatory pricing to maintain their dominant market positions, further limiting consumer choice and innovation.

71.   Both cases involve significant breaches of key antitrust laws, specifically the Clayton Act and the Sherman Act:

72.   **Section 2 of the Sherman Act**: This section addresses monopolization, attempted monopolization, and conspiracy to monopolize. Both Google and the telecommunications providers are accused of engaging in practices designed to maintain or achieve monopoly power, thereby restricting competition in their respective markets. The Antitrust Class Action complaint specifically argues that the bundling of Wi-Fi calling and mobile data with traditional cellular

services, along with exclusionary practices and predatory pricing, are clear examples of this unlawful behavior.

73.   **Section 1 of the Sherman Act**: This section prohibits contracts, combinations, or conspiracies that unreasonably restrain trade. The Antitrust Class Action complaint alleges that the telecommunications providers' bundling practices constitute an unreasonable restraint of trade by effectively forcing consumers to purchase services they may not need, thereby limiting competition from standalone service providers.

74.   **Section 7 of the Clayton Act**: This section prohibits mergers and acquisitions where the effect may be substantially to lessen competition or to tend to create a monopoly. In the Google case, the government's argument extends to the company's practices that reinforce its monopoly in the search market. For the Antitrust Class Action complaint, the focus is on the impact of recent telecommunications mergers and acquisitions, including T-Mobile's purchase of Sprint and the latest acquisitions by the Defendants of numerous Mobile Virtual Network Operators (MVNOs). These acquisitions have further consolidated market power, diminished competition, and restricted consumer choices in the markets for Wi-Fi calling, mobile data, and traditional cellular services.

75.   These cases exemplify how dominant market players can use their positions to engage in practices that undermine competition, violate antitrust laws, and harm consumers. The outcome of these cases will have far-reaching implications for how monopolistic behavior is addressed and regulated in both the digital and telecommunications sectors.

### B.  Enhanced Comparison to Google LLC Antitrust Decision

76.   The Google decision serves as a critical precedent in addressing monopolistic practices within the digital realm, emphasizing the court's proactive stance against exclusionary tactics that stifle

competition. In a manner strikingly similar to Google's actions, the Defendants in the Antitrust

Class Action case have employed bundling strategies to entrench their dominance in the

telecommunications market, thereby suppressing innovation and severely limiting consumer

choice.

77.     In the Google case, the court identified the harmful effects of exclusionary agreements that

prevented competitors from gaining a meaningful foothold in the market. Similarly, the

Defendants here have bundled Wi-Fi calling and mobile data with cellular services, effectively

eliminating the possibility of a competitive standalone market for these services. This practice

not only mirrors the anti-competitive behavior condemned in the Google ruling but also

exacerbates the situation by targeting essential services used daily by millions of consumers.

78.     **Specific Consumer Harm**: The Defendants' actions have led to inflated costs for consumers,

who are forced to pay for bundled services they may not need or want. This practice particularly

disadvantages low-income populations, who are deprived of more affordable communication

options that could otherwise be available through standalone Wi-Fi calling or mobile data

services. For instance, if standalone services were available, consumers could save an estimated

X% per month, a significant financial relief that is currently being denied.

79.     **Anticipating Counterarguments**: The Defendants might argue that bundling enhances service

quality or is a standard industry practice. However, this justification falls flat when considering

the broader market impact. Bundling artificially inflates prices and restricts consumer choice,

with no substantial benefit to the consumer that outweighs the competitive harm. The Google

decision rejected similar justifications, recognizing them as thinly veiled attempts to maintain

market dominance.

80.     **Broader Implications**: A ruling in favor of the Plaintiff would not only rectify the specific

competitive harms in this case but also set a precedent for future antitrust enforcement in the telecommunications and technology sectors. Just as the Google decision reshaped the landscape for digital markets, this case offers the court an opportunity to establish critical protections for consumers and competitors in an increasingly monopolized industry.

81. The parallels between the Defendants' conduct in this case and the practices condemned in the Google decision are not just coincidental but indicative of a broader pattern of anticompetitive behavior that demands judicial intervention. By applying the same rigorous antitrust principles from the Google case, the court can restore fair competition in the telecommunications market and protect consumer interests.

82. These anticompetitive practices are clearly demonstrated as parallel dealings to the five precedent cases, where court decisions have consistently condemned such behavior. The Court now faces an unprecedented opportunity to address these violations by holding the Defendants accountable under the Sherman and Clayton Acts. By doing so, the Court can restore balance to the telecommunications market, protect consumer rights, and set a global precedent for antitrust enforcement in the digital age. The Defendants' actions must be met with a decisive ruling that not only rectifies the specific harms in this case but also deters future anticompetitive behavior, ensuring that even the largest corporations adhere to the principles of fair competition.

## <u>STATEMENT OF GRIEVANCES</u>

83. The Defendants, AT&T, Verizon, T-Mobile, and Deutsche Telekom, have systematically deprived consumers of choice by forcing millions to purchase unnecessary cellular services to access Wi-Fi calling. This predatory bundling strategy constitutes an illegal tying arrangement, flagrantly violating antitrust laws. Although Wi-Fi calling is technologically independent of

cellular services, the Defendants have deceptively marketed it as a "feature" of their bundled plans, concealing its potential as a standalone, cost-effective service. This deceitful practice enables the Defendants to maintain inflated prices, creating an illusion of added value while primarily benefiting themselves by offloading network traffic and improving coverage without incurring additional infrastructure costs.

84.    This anti-competitive behavior not only harms consumers by imposing artificially high prices but also stifles long-term innovation in the telecommunications industry. By suppressing the market for standalone Wi-Fi calling services, the Defendants actively hinder the evolution of more diverse, flexible, and cost-effective communication solutions. Their actions are a clear attempt to limit consumer choice, maintain market dominance, and protect outdated business models at all costs.

85.    For over six years, these Defendants have exploited their market dominance by forcing millions of consumers into costly bundled services, disproportionately affecting several vulnerable populations. Among those disadvantaged groups are approximately 37.9 million people living in poverty in the U.S. as of 2022, who are particularly burdened by rising costs of essential services, making it increasingly difficult for them to afford inflated prices tied to these bundles.

86.    The elderly, numbering about 54 million in 2023, many of whom live on fixed incomes, face challenges with both affordability and the complexity of bundled mobile service packages that often include unnecessary features. The chronically ill, with six in ten adults in the U.S. having a chronic disease and four in ten having two or more, require reliable communication for healthcare needs but are vulnerable to the high costs and limitations of bundled services.

87.    Residents of nursing homes and assisted living facilities, which include approximately 1.3 million people in nursing homes and 800,000 in assisted living facilities, often have limited autonomy

and could benefit greatly from standalone Wi-Fi services, as they live in and rarely, if ever, leave facilities equipped with Wi-Fi connectivity, offering a potential for significant savings. Economically disadvantaged families, with 11.6% of U.S. families living below the poverty line in 2022, struggle to manage high costs and inflexible service options, which exacerbates their financial difficulties.

### A.  Key Issues

88.   The fact that the Defendants are not unbundling Wi-Fi calling from cellular services, along with the compulsory bundling of mobile data with cellular calling and texting, forces consumers into purchasing more expensive, full-service packages they may not need. This practice disregards the potential for more affordable standalone services. Standalone Wi-Fi calling that could be offered at a significantly lower cost, estimated to be about $6.50 per month. A special package for a family of 4 for a total of $20 per month. Today a family of 4 is paying an average of $240 per month for services they could chose not to purchase. This strategy not only limits consumer choice and flexibility but also exacerbates the financial burden on those who could benefit most from more cost-effective options.

### B.  Legal and Moral Imperatives

89.   Antitrust violations and unfair business practices by dominant telecom companies have led to the exploitation of vulnerable consumers, particularly those who are economically disadvantaged or lack access to competitive service options. These practices contribute to the widening of the digital divide, as they disproportionately affect low-income individuals and communities, limiting their access to affordable and essential communication services and further entrenching existing inequities in the digital landscape.

## DEFENDANTS' BUNDLING PRACTICES AND ANTITRUST VIOLATIONS

90.     AT&T, Verizon, T-Mobile, and Deutsche Telekom (Deutsche Telekom is the majority shareholder of T-Mobile US) collectively control over 97% of the U.S. smartphone mobile market. Their business model mandates two key bundles, eliminating consumer choice for standalone services, using bundles for a) Cellular calling and texting services with Wi-Fi calling and b) Cellular calling and texting with mobile data.

91.     These practices raise significant antitrust concerns and disproportionately impact vulnerable consumers.

### A.  Bundle 1: Cellular Calling and Texting Tied to Wi-Fi Calling

#### 1.  Antitrust Violations

92.     **Tie-In Sales**: The compulsory bundling violates Section 1 of the Sherman Act and Section 3 of the Clayton Act.

93.     **Forced Sales**: The absence of standalone options constitutes forced sales, violating Section 1 of the Sherman Act and Section 3 of the Clayton Act.

94.     **Price Fixing**: The uniform pricing of Wi-Fi calling at zero while bundling demonstrates price fixing, violating Section 1 of the Sherman Act.

95.     **Predatory Pricing**: Offering Wi-Fi calling at below-cost rates violates Section 2 of the Sherman Act.

96.     **Exclusive Dealing**: The absence of standalone options demonstrates exclusive dealing, violating Section 3 of the Clayton Act.

#### 2.  Impact on Consumers

97.     **Unfair Cost Shifting**: Subscribers pay twice for initiating Wi-Fi calls: a) Through their separate Internet service and b) Through higher, cellular-based prices for calling and texting.

98.    **Disproportionate Impact**: This practice harms vulnerable populations such as the elderly, nursing home residents, and economically disadvantaged individuals.

99.    This bundling strategy violates multiple antitrust laws while exploiting consumers, particularly those most vulnerable to such practices.

### B. Bundle 2: Cellular Calling and Texting Tied to Mobile Data

#### 1. Antitrust Violations

100.    **Tie-In Sales**: The mandatory bundling constitutes an illegal tie-in sale under Section 1 of the Sherman Act and Section 3 of the Clayton Act.

101.    **Forced Sales**: The absence of standalone mobile data options for smartphones constitutes forced sales, violating both the Sherman and Clayton Acts.

102.    **Price Fixing**: Similar pricing strategies across Defendants indicate coordinated efforts to maintain high market prices, violating Section 1 of the Sherman Act.

103.    **Predatory Pricing**: Aggressive pricing strategies aimed at undercutting potential competitors violate Section 2 of the Sherman Act.

104.    **Exclusive Dealing**: The absence of standalone mobile data services for smartphones indicates exclusive dealing practices, violating Section 3 of the Clayton Act.

### C. Bundling Antitrust Violations

105.    The evidence overwhelmingly supports the Plaintiffs' claims of antitrust violations:

106.    **Sherman Act Violation: Section 1 (Restraint of Trade):** Restraint of trade involves actions by companies that interfere with free competition in the marketplace. In this Antitrust Class Action, the Defendants—major telecommunications carriers such as AT&T, Verizon, T-Mobile, and Deutsche Telekom (Deutsche Telekom is the majority shareholder of T-Mobile US) —are accused of engaging in practices that unfairly limit the ability of competitors to operate in the

market. Specifically, by tying Wi-Fi calling and mobile data services to cellular and texting plans, these companies prevent consumers from accessing standalone Wi-Fi calling and mobile data services, which could be offered at a significantly lower cost. This restriction not only limits consumer choice but also stifles competition from smaller providers who might wish to offer innovative, lower-cost services. This behavior violates Section 1 of the Sherman Act, which prohibits contracts, combinations, or conspiracies that unreasonably restrain trade.

107. **Sherman Act Violation: Section 2 (Monopolization):** Monopolization occurs when a company uses its dominant market position to suppress competition and maintain its market dominance. The Antitrust Class Action alleges that the Defendants have used their control over essential telecommunications infrastructure to dominate the market for Wi-Fi calling. By tying Wi-Fi calling and mobile data to other services and using exclusive dealing arrangements, these companies have allegedly engaged in exclusionary conduct designed to prevent competitors from gaining a foothold in the market. This behavior breaches Section 2 of the Sherman Act, which addresses monopolistic practices and attempts to monopolize any part of trade or commerce.

108. **Clayton Act Violation: Section 2 (Barriers to Entry):** The Defendants engage in price discrimination that distorts the market and harms competition. Their zero-cost model for Wi-Fi calling when bundled, contrasted with the inability to purchase it standalone, constitutes illegal price discrimination.

109. **Clayton Act Violation: Section 3 (Barrier to Entry):** The Defendants enter into exclusive dealing arrangements that substantially lessen competition. Their tying of Wi-Fi calling and mobile data to cellular services effectively forecloses a substantial portion of the market to potential competitors.

110. **Clayton Act Violation: Section 7 (Tacit Collusion):** The Defendants' tacit collusion through

parallel conduct in bundling practices and pricing strategies has effects similar to an anticompetitive merger under this section.

111.    **Sherman Act Violation: Section 1 (Price Fixing):** Price fixing, a violation of Section 1 of the Sherman Act, occurs when competitors conspire to manipulate prices. The Defendants are accused of collectively bundling Wi-Fi calling with cellular services at inflated prices, preventing the availability of standalone Wi-Fi calling services, and fixing the cost of Wi-Fi calling at zero despite the actual costs involved.

112.    These practices have widespread effects. Consumers are compelled to overpay for bundled services they may not need, while being denied access to affordable standalone options. The coordinated actions across major carriers point to collusion, maintaining artificially high prices and stifling competition. This directly harms the Plaintiffs and the entire class financially. By pricing Wi-Fi calling at zero within their bundles, the Defendants have strategically devalued the technology surrounding Wi-Fi calling and texting, undermining its market potential. Ultimately, these actions create a market that restricts choice, hinders innovation, and preserves the Defendants' dominance at the expense of both consumers and potential competitors.

113.    **Clayton Act Violation: Section 3 (Exclusive Dealing):** Exclusive dealing refers to agreements that restrict a company from buying, selling, or promoting the products of a competitor. In this Antitrust Class Action, the Defendants are alleged to have engaged in exclusive arrangements that prevent other telecommunications providers from offering competing Wi-Fi calling services. These arrangements may involve contracts with device manufacturers or service providers that limit the ability of other companies to compete in the market. Such practices create significant barriers to entry for new competitors and help maintain the Defendants' control over the market, violating Section 3 of the Clayton Act, which prohibits exclusive dealing arrangements that

substantially lessen competition or tend to create a monopoly.

114. **Sherman Act Violation: Section 2 (Monopolization) & Clayton Act Violation: Section 7 (Mergers and Acquisitions):** Barriers to entry are obstacles that prevent new competitors from easily entering an industry or market. In this Antitrust Class Action, the Defendants are accused of creating and maintaining high barriers to entry in the Wi-Fi calling market through practices such as bundling services, exclusive dealing arrangements, and controlling essential telecommunications infrastructure. By making it difficult for new entrants to offer competing services, the Defendants protect their market dominance and limit consumer choice. This behavior violates Section 2 of the Sherman Act, which prohibits monopolization, as well as Section 7 of the Clayton Act, which addresses anticompetitive mergers and acquisitions that create barriers to market entry.

115. **FTC Act Violation: Section 5 (Unfair Methods of Competition):** Fraudulent misrepresentation involves making false or misleading statements with the intent to deceive. In this Antitrust Class Action, the Defendants are accused of fraudulent misrepresentation by falsely claiming that Wi-Fi calling services are "free" no-charge add-ons to cellular and texting services bundles. These claims were allegedly made to maintain the bundled service model making Wi-Fi calling and texting appear to be integral to cellular calling and texting, which is more profitable for the Defendants. This behavior violates Section 5 of the FTC Act, which prohibits unfair methods of competition, including deceptive practices that harm consumers and competitors

   D. **The Defendants' MVNO Acquisitions in Their Quest to Expand Their Market Dominance**

116. Verizon MVNO Acquisitions in Their Quest to Expand Their Market Dominance:

117. **TracFone (2021):** Verizon acquired TracFone, the largest MVNO in the United States, which

operated under several brands, including Straight Talk and Simple Mobile, serving approximately 20 million customers. This acquisition significantly expanded Verizon's reach in the prepaid market, further solidifying its control over a broader segment of the wireless industry.

118. **Yahoo Mobile (2021):** Verizon launched Yahoo Mobile as an MVNO leveraging its existing network, effectively integrating the Yahoo brand into its wireless services. While not a traditional acquisition, it showcased Verizon's strategy of using its network infrastructure to expand its customer base through MVNOs.

119. AT&T MVNO Acquisitions in Their Quest to Expand Their Market Dominance:

120. **Cricket Wireless (2014):** AT&T acquired Leap Wireless, the parent company of Cricket Wireless, and rebranded it as its primary prepaid brand. This acquisition eliminated a significant competitor in the budget wireless market, consolidating AT&T's control over the prepaid segment.

121. **GoPhone (2017):** While technically not an acquisition, AT&T rebranded its longstanding prepaid service, GoPhone, as part of the Cricket Wireless brand, further consolidating its prepaid offerings under a single umbrella.

122. T-Mobile MVNO Acquisitions in Their Quest to Expand Their Market Dominance:

123. **MetroPCS (2013):** T-Mobile US acquired MetroPCS, an MVNO that catered to budget-conscious consumers with prepaid services. The merger allowed T-Mobile to strengthen its position in the prepaid market, enhancing its competitive edge and contributing to market consolidation.

124. **Mint Mobile (2023):** T-Mobile acquired Ka'ena Corporation, the parent company of Mint Mobile, a low-cost MVNO known for its affordable prepaid mobile plans. This acquisition enabled T-Mobile to further tap into the budget segment of the market, expanding its customer

base and market control.

125.  These acquisitions by the Big 3 Mobile Network Operators— AT&T, Verizon, T-Mobile (and

thus Deutsche Telekom)—illustrate a clear and ongoing strategy of market consolidation, where

these dominant players systematically acquire MVNOs to reduce competition and expand their

monopolistic control over the wireless market. Each acquisition has resulted in fewer independent

competitors, further limiting consumer choice and reinforcing the market dominance of these

three major players. The Defendants' actions in this case are emblematic of this broader trend of

consolidation, further entrenching their monopolistic power in the industry.

126.  In **United States v. American Tobacco Co.** (1911) and **United States v. Aluminum Co. of

America (Alcoa)** (1945), the courts ruled that a small group of companies exercising dominant

market control constituted monopolistic practices in violation of the Sherman Antitrust Act.

These rulings affirm that even a few companies can collectively hold monopolistic power if their

actions suppress competition and control the market.

### E.  Relevant Appellate and Supreme Court Precedents Directly Support These Claims

127.  In **United States et al. v. Deutsche Telekom AG, T-Mobile US, Inc., SoftBank Group Corp.,

and Sprint Corporation**, the U.S. Department of Justice warned that the merger between Sprint

and T-Mobile would significantly reduce competition in the wireless industry, limiting consumer

choices and leading to higher prices. The DOJ expressed concern that reducing the number of

major wireless carriers from four to three would harm the competitive landscape. Although the

case was settled with conditions requiring the divestiture of certain assets to DISH Network, the

government's intervention highlighted the risks of diminished competition and the potential

negative impact on consumers in the telecommunications market. Unfortunately, today's reality

reflects these concerns, as the merger has indeed led to reduced competition, fewer choices for consumers, and the continued dominance of a small group of carriers in the market.

128.     The **United States v. Socony-Vacuum Oil Co.** case is highly relevant to our antitrust claims against AT&T, Verizon, T-Mobile, and Deutsche Telekom. In Socony-Vacuum, the Supreme Court established that price-fixing agreements are per se violations of Section 1 of the Sherman Act, meaning such agreements are inherently illegal without needing to prove their impact on the market. This precedent directly applies to our case, where we allege that the Defendants have engaged in similar anticompetitive behavior by collectively bundling Wi-Fi calling with cellular services at inflated prices and preventing the availability of standalone Wi-Fi calling options. This coordinated action effectively controls the price structure and restricts consumer choice, mirroring the price-fixing condemned in Socony-Vacuum. Additionally, the bundling practices can be seen as forcing consumers into exclusive arrangements, further supporting our claims of antitrust violations. The Socony-Vacuum ruling strengthens our case by demonstrating that the Defendants' actions constitute established antitrust violations within the telecommunications market.

129.     **United States v. Apple, Inc.** (2015) affirmed that price-fixing agreements violate Sherman Act §1, supporting our claims against the Defendants' coordinated pricing strategies for bundled services. This precedent strengthens our argument that their actions constitute illegal price-fixing in the telecommunications market.

130.     **United States v. Microsoft Corp.** (2001) ruled against tying practices that violated Sherman Act §1 and §2. This decision directly applies to our case, where the Defendants bundle Wi-Fi calling with cellular services, constituting illegal tying arrangements that stifle competition and limit consumer choice.

131. **ZF Meritor, LLC v. Eaton Corp.** (2012) found that certain exclusionary contracts violated antitrust laws. This ruling supports our claims that the Defendants' bundling practices and prevention of standalone Wi-Fi calling services create illegal barriers to entry and exclusive dealing arrangements, harming both consumers and potential competitors.

132. These landmark cases collectively provide a robust legal framework for our antitrust claims against the Defendants' anticompetitive practices in the telecommunications industry. They support our arguments that the Defendants' actions have significantly distorted the Wi-Fi calling market, harmed competition, and limited consumer choice through illegal price-fixing, tying arrangements, and exclusionary contracts. By applying these precedents to our case, we establish a strong foundation for challenging the Defendants' practices, demonstrating how their bundling strategies and prevention of standalone Wi-Fi calling services violate multiple aspects of antitrust law. This legal basis not only strengthens our claims but also provides a clear pathway for seeking remedies to restore fair competition in the telecommunications market, reshaping the industry to benefit consumers and foster innovation.

## DEFENDANTS FRAUDULENT MISREPRESENTATION, DECEIT, AND MISLEADING CONDUCT

### A. Fraudulent Misrepresentation

133. In their aggressive marketing campaigns, AT&T, Verizon, T-Mobile, and Deutsche Telekom deliberately obscured the reality that Wi-Fi calling incurs data costs for consumers, either through their home internet plans or public Wi-Fi usage. As industry leaders, the Defendants were fully aware of the underlying technology and associated costs, making their misrepresentation not just misleading, but knowingly false.

**134.**   The intent was clearly to induce consumers to use Wi-Fi calling more frequently, effectively offloading network traffic onto consumer-paid Wi-Fi networks. This strategy allowed the Defendants to reduce their infrastructure costs while simultaneously increasing data usage—and thus, revenue—from their customers. This discrepancy between marketing claims and actual costs not only harmed individual consumers financially but also distorted the entire market for telecommunications services, stifling potential competition and innovation in standalone Wi-Fi calling solutions.

### B.  Deceitful Conduct

**135.**   The Defendants engaged in a multi-faceted deception strategy, concealing material facts about Wi-Fi calling's data consumption and costs while exploiting consumers' limited technical knowledge. AT&T, Verizon, T-Mobile, and Deutsche Telekom breached their duty to provide full-service information, intentionally withholding crucial details to boost adoption at consumers' expense. Their deceptive bundling and misleading marketing emphasized benefits without explaining drawbacks, creating an environment where consumers couldn't make informed decisions. This comprehensive approach manipulated demand and stifled potential competition in standalone Wi-Fi calling services, effectively distorting the telecommunications market to maintain their dominance.

### C.  Misleading Conduct

**136.**   The Defendants engaged in deceptive bundling practices by obscuring the true costs and benefits of their services, exploiting the technical complexity and consumer knowledge gap to their advantage. Through misleading marketing, they emphasized the benefits of their offerings while deliberately omitting or downplaying the associated drawbacks, leaving consumers with a distorted understanding of the services they were purchasing.

### D. Legal Precedents and Applications

137.   **In re Vivendi Universal (2011)** established liability for materially misleading statements affecting market perception. This precedent directly applies to the Defendants' alleged misrepresentation about the feasibility of separating Wi-Fi calling from cellular services, strengthening our claim that they deliberately misled consumers and the market.

138.   **Titan Group v. Faggen (1975)** ruled that concealing material facts constitutes fraud when there's a duty to disclose. This supports our argument that the Defendants fraudulently failed to reveal the viability of standalone Wi-Fi calling and mobile data services, despite their duty to provide accurate information to consumers.

139.   **FTC v. Colgate-Palmolive Co. (1965)** determined that deceptive advertising influencing consumer behavior violates consumer protection laws. This precedent is relevant to the Defendants' alleged deceptive marketing of bundled services without disclosing standalone options, exposing them to liability under consumer protection statutes.

140.   Collectively, these cases provide a robust legal foundation for our claims of fraudulent misrepresentation and deceptive practices. They demonstrate that the Defendants' actions not only violate antitrust laws but also constitute fraudulent misrepresentation, strengthening our case for comprehensive remedies and additional liability.

## INDICATIONS OF CARTEL BEHAVIOR IN THE DEFENDANTS' COORDINATED PRACTICES AND MARKET IMPACT

### A. Unauthorized Use of Technology and Know-how Exposes Cartel Conduct

141.   The Defendants, AT&T, Verizon, T-Mobile, and Deutsche Telekom (the majority shareholder of T-Mobile US), have been leveraging Wi-Fi calling and texting technology and knowhow without

authorization. By concealing anti-competitive practices of utilizing Wi-Fi calling and texting technology and knowhow without authorization, the Defendants have been able to maintain their market dominance. Plaintiffs expose the Defendants' "dirty secret"—their coordinated efforts to stifle competition and maximize profits at the expense of consumers.

### B. Anticompetitive and Anticonsumer Practices

#### 1. Offloading

142. The Defendants engage in the practice of offloading call traffic, text traffic, and mobile data traffic from their cellular networks to Wi-Fi networks. By doing so, they reduce the strain on their cellular infrastructure, effectively increasing network capacity without substantial additional investments. This practice allows them to oversubscribe their services while engaging in anti-competitive behaviors, such as tying arrangements, forced sales, predatory pricing, and exclusive dealing.

143. The freed-up capacity is monetized by reselling it to Mobile Virtual Network Operators (MVNOs), further boosting the Defendants' revenue streams. Offloading not only maximizes their profits but also reduces the need for additional infrastructure, such as new cell towers, saving billions in costs Additionally, by monopolizing Wi-Fi calling and texting technology and knowhow, the Defendants gain greater control over the market, limiting competition and maintaining their dominant position.

#### 2. Cost Shifting to Subscribers

144. The burden of offloading is unfairly shifted onto consumers, who bear both the already high cost of cellular access as well as Wi-Fi access piggy-backed by the Defendants without receiving any financial benefits. Consumers provide network relief to the Defendants by using their personal Wi-Fi connections for calls and data, yet they receive no discounts or compensation for this

contribution. This arrangement allows the Defendants to reduce their operational costs and infrastructure investments all the while increasing and shifting the financial burden on consumers.

### C.  Market Implications of Defendants' Anticompetitive and Anticonsumer Practices[1]

145.  **Cost Savings**: Wi-Fi calling enables operators to significantly reduce their operational costs by offloading voice traffic from their cellular networks to Wi-Fi networks. This practice allows operators to avoid the expensive process of acquiring additional spectrum, which is necessary to expand and maintain their cellular networks. By relying on consumers' existing Wi-Fi infrastructure, operators can cut down on costly infrastructure investments, such as new cell towers and expanded network capacity.

146.  **Blocking Competition**: By bundling Wi-Fi calling services with their existing cellular plans, the Defendants effectively prevent competition from providers that could offer standalone Wi-Fi calling and texting at lower prices. This bundling strategy restricts consumer choice, forcing users to purchase comprehensive service packages from the carriers and limiting their ability to choose alternative, more affordable options from independent providers.

147.  **Revenue and Market Control**: The Defendants exploit Wi-Fi calling to create new revenue

---

[1] Ray Mota (ACG) and Peter Curtin (Cisco) Presentation, "Voice Over Wi-Fi: An Economic View," May 24, 2016.
"Economic Advantages of Virtualized WiFi Access for VoWiFi," ACG Research report, 2017 (sponsored by Affirmed Networks).
VoLTE/VoWiFi: capacity, reach and capability, Deloitte Touch Tohmatsu Limited, 2016 <https://www2.deloitte.com/content/dam/Deloitte/global/Documents/Technology-Media-Telecommunications/gx-tmt-prediction-voice-over-wifi-lte.pdf>
Ray Mota and Elias Aravantinos, "ACT Research: With VoWiFi, it's all about the economics," October 22, 2015, < https://www.fierce-network.com/tech/acg-research-vowifi-it-s-all-about-economics>
"How, When and Wi-Fi: Weaving Wi-Fi into Your Network Experience through Virtualization," Affirmed Networks, 2017 <https://www.affirmednetworks.com/wp-content/uploads/2017/12/Affirmed-Wifi-Solution-Brief.pdf>

streams while reducing costs. By offloading traffic from their cellular networks, they free up capacity, which they then license to MVNOs. This control over both the offloaded capacity and the associated licensing fees allows them to monopolize the licensing of mobile services. By bundling these services with cellular offerings and setting high licensing fees, the Defendants stifle competition, block smaller competitors, and maintain their dominant market position, maximizing financial benefits across the ecosystem.

### D.  Impact of Defendants' Anticompetitive and Anticonsumer Practices

148.    **Economically Disadvantaged**: Millions of economically disadvantaged individuals are forced to pay for bundled services they neither need nor want. These services, often marketed as essential, leave vulnerable populations with little choice but to incur unnecessary expenses, further straining their limited financial resources.

149.    **Impact on Competition and Innovation**: The Defendants' monopolistic practices severely stifle competition by erecting barriers that prevent new entrants from entering the market. This reduces consumer choice and suppresses innovation, as potential competitors who could introduce novel, cost-effective solutions are effectively shut out. By maintaining a stranglehold on the market, the Defendants ensure their continued dominance at the expense of technological advancement and consumer welfare.

### E.  Specific Impact of Defendants' Anticompetitive and Anticonsumer Practices on the Class

150.    **General Subscribers Class**: Around 373 million major carrier subscribers are subjected to misleading marketing practices and coercive tactics that push them into purchasing expensive bundled plans. These consumers are denied the option to choose more affordable, standalone services, leading to inflated costs and diminished consumer satisfaction.

### F.  Weighing the Evidence

151.   The Defendants' control of 97% of the U.S. mobile market, their uniform bundling practices, and the lack of standalone options point to coordinated efforts to maintain market dominance. This evidence strongly supports the Plaintiffs' claims of antitrust violations, highlighting significant consumer harm, overcharges, and barriers to entry.

### G.  Antitrust Violations

152.   **Sherman Act Section 1**: Conspiracy in restraint of trade through coordinated bundling practices.

153.   **Sherman Act Section 2**: Monopolization of Wi-Fi calling and mobile data services through predatory pricing and exclusionary practices.

154.   **Clayton Act Section 2**: Price discrimination through zero-cost bundled Wi-Fi calling versus no standalone option.

155.   **Clayton Act Section 3**: Exclusive dealing arrangements preventing market entry for smaller competitors.

156.   **Clayton Act Section 7**: Mergers and acquisitions, particularly the T-Mobile/Sprint merger, that have substantially lessened competition, reinforcing the Defendants' market power as Defendants are purchasing many MVNOs to increase their monopoly power by acquisition.

157.   The comprehensive body of evidence and relevant legal precedents overwhelmingly support the Plaintiffs' claims. The Defendants' practices violate multiple sections of both the Sherman and Clayton Acts, contributing to significant market distortion, consumer harm, and suppression of competition. The Court must impose substantial penalties and mandate the offering of standalone services to restore fair competition in the telecommunications market.

## THE PARTIES

### A.  The Plaintiffs

158.   Plaintiffs Ray Leon, Richard Inza, and Michael Inza: These individuals are residing in Florida.

159.   **General Subscribers Class**: Plaintiffs Ray Leon (AT&T), Richard Inza (Verizon), and Michael Inza (T-Mobile) are current subscribers of the Defendants' mobile services or their respective Mobile Virtual Network Operators (MVNOs) and together with approximately 373 million major carrier subscribers of the Defendants' mobile services or their respective MVNOs have personally experienced inflated prices, reduced service quality, or other anticompetitive harms as a result of the Defendants' unlawful practices and unlawful conduct.

160.   The class representatives and each member of the class has been significantly impacted by the Defendants' antitrust and anticompetitive practices, which have suppressed competition, manipulated market conditions, and unlawfully deployed Wi-Fi calling and texting technologies and know-how from a competitor, resulting in substantial financial and consumer harm.

### B.  The AT&T Defendants

161.   On information and belief, Defendant AT&T, Inc. is a Delaware corporation with a principal place of business at 175 E Houston Street, San Antonio, Texas 78205. AT&T, Inc. may be served with process through its registered agent, the CT Corp System, at 1999 Bryan St., Ste. 900 Dallas, Texas 75201-3136. On information and belief, AT&T, Inc. is registered to do business in the District of Columbia.

162.   On information and belief, Defendant AT&T Corporation is a New York corporation with a principal place of business at One AT&T Way Bedminster, New Jersey 07921. AT&T Corporation may be served with process through its registered agent, the CT Corp System, at 1999 Bryan St., Ste. 900 Dallas, Texas 75201-3136. On information and belief, AT&T

Corporation is registered to do business in the District of Columbia. On information and belief, AT&T Corporation is a wholly owned subsidiary of AT&T, Inc.

163. On information and belief, Defendant AT&T Services, Inc. is a Delaware corporation with a principal place of business at 175 E Houston Street, San Antonio, Texas 78205. AT&T Services, Inc. may be served with process through its registered agent, the CT Corp System, at 1999 Bryan St., Ste. 900 Dallas, Texas 75201-3136. On information and belief, AT&T Services, Inc. is registered to do business in the District of Columbia. On information and belief, AT&T Services, Inc. is a wholly owned subsidiary of AT&T, Inc.

164. On information and belief, Scott T. Ford, Glenn H. Hutchins, William E. Kennard, Stephen J. Luczo, Marissa A. Mayer, David R. Mcatee II, Michael B. McCallister, Beth E. Mooney, Matthew K. Rose, John Stankey, Cynthia B. Taylor, and Luis A. Ubiñas are each a member of the Board of Directors of AT&T and acting in an individual corporate capacity and as part of a collective with other members of the Board of Directors of AT&T regularly conducts business or is often present at the principal place of business of AT&T at 175 E Houston Street, San Antonio, Texas 78205 and may be served with process at that location or through its registered agent, the CT Corp System, at 1999 Bryan St., Ste. 900 Dallas, Texas 75201-3136.

165. On information and belief, the above AT&T Defendants regularly conduct and transact business in the District of Columbia, throughout the United States, and within this District, and as set forth herein, have committed and continue to commit, acts within and outside the District of Columbia and within this District that violate the Sherman and Clayton Acts, including but not limited to tying arrangements, forced sales, exclusive dealing, price fixing, price discrimination, and predatory pricing, all of which suppress competition, manipulate market conditions, and harm consumers and competitors alike.

### C. The T-Mobile Defendants

166.  On information and belief, T-Mobile USA, Inc. is a Delaware corporation with its principal place of business at 12920 Southeast 38th Street, Bellevue, Washington 98006. T-Mobile USA, Inc. may be served through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. On information and belief, T-Mobile USA, Inc. is registered to do business in the District of Columbia.

167.  On information and belief, T-Mobile USA, Inc. is a subsidiary of German telecommunications company Deutsche Telekom AG headquartered in Bonn Germany Delaware corporation with its principal place of business at Friedrich-Ebert-Allee 140, Bonn, Germany 53113. Deutsche Telekom AG may be served through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. On information and belief, Deutsche Telekom AG through its subsidiary T-Mobile USA, Inc. has regular and established places of business throughout this District.

168.  On information and belief, Timotheus Höttges, André Almeida, Marcelo Claure, Srikant M. Datar, Srinivasan Gopalan, Dr. Christian P. Illek, James J. Kavanaugh, Raphael Kübler, Thorsten Langheim, Dominique Leroy, Letitia A. Long, Mike Sievert, Teresa A. Taylor, and Kelvin R. Westbrook are each a member of the Board of Directors of T-Mobile and acting in an individual corporate capacity and as part of a collective with other members of the Board of Directors of T-Mobile regularly conducts business or is often present at the principal place of business of T-Mobile at 12920 Southeast 38th Street, Bellevue, Washington 98006 and may be served with process at that location or through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

169.  On information and belief, Timotheus Höttges, Dr. Ferri Abolhassan, Birgit Bohle, Srini Gopalan,

Christian P. Illek, Thorsten Langheim, Dominique Leroy, and Claudia Nemat, each are a member of the Board of Directors of Deutsche Telekom AG and acting in an individual corporate capacity and as part of a collective with other members of the Board of Directors of Deutsche Telekom AG regularly conducts business or is often present at the principal place of business of T-Mobile at 12920 Southeast 38th Street, Bellevue, Washington 98006 and may be served with process at that location or through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

170. On information and belief, the above T-Mobile Defendants regularly conducts and transacts business in the District of Columbia, throughout the United States, and within this District, and as set forth herein, has committed and continues to commit, acts within and outside the District of Columbia and within this District that violate the Sherman and Clayton Acts, including but not limited to tying arrangements, forced sales, exclusive dealing, price fixing, price discrimination, and predatory pricing, all of which suppress competition, manipulate market conditions, and harm consumers and competitors alike.

### D. The Verizon Defendants

171. On information and belief, Verizon Communications, Inc. is a Delaware corporation with a principal place of business at 140 West Street, New York, New York 10013. Verizon Communications, Inc. may be served with process through its registered agent, the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. On information and belief, Verizon Communications, Inc. is registered to do business in the District of Columbia.

172. On information and belief, Cellco Partnership dba Verizon Wireless is a Delaware general partnership with a principal place of business at One Verizon Way Basking Ridge, New Jersey

07920. Cellco Partnership dba Verizon Wireless may be served with process through its registered agent, the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington Delaware 19801. On information and belief, Cellco Partnership dba Verizon Wireless is a wholly owned subsidiary of Verizon Communications, Inc. On information and belief, Cellco Partnership dba Verizon Wireless is registered to do business in the District of Columbia.

173.   On information and belief, Verizon Services Corp. is a Delaware corporation with a principal place of business at 1717 Arch Street, 21st Floor Philadelphia, Pennsylvania 19103. Verizon Services, Corp. may be served with process through its registered agent, the CT Corporation System, at 1999 Bryan St., Ste. 900 Dallas, Texas 75201-3136. On information and belief, Verizon Services Corp. is a wholly owned subsidiary of Verizon Communications, Inc. On information and belief, Verizon Services Corp. is registered to do business in the District of Columbia.

174.   On information and belief, Verizon Business Network Services Inc. is a Delaware corporation with a principal place of business at 22001 Loudin County Parkway Ashburn, Virginia 20147. Verizon Business Network Services, Inc. may be served with process through its registered agent, the CT Corporation System, at 1999 Bryan St., Ste. 900 Dallas, Texas 75201-3136. On information and belief, Verizon Business Network Services, Inc. is a wholly owned subsidiary of Verizon Communications, Inc. On information and belief, Verizon Business Network Services, Inc. is registered to do business in the District of Columbia.

175.   On information and belief, Vittorio Colao, Shellye L. Archambeau, Mark T. Bertolin, Roxanne S. Austin, Melanie L. Healey, Laxman Narasimhan, Clarence Otis, Jr., Daniel H. Schulman, Rodney E. Slater, Carol B. Tomé, Vandana Venkatesh, Hans Vestberg,  and Gregory G. Weaver

are each a member of the Board of Directors of Verizon and acting in an individual corporate capacity and as part of a collective with other members of the Board of Directors of Verizon regularly conducts business or is often present at the principal place of business of Verizon at 140 West Street, New York, New York 10013 and at 600 Hidden Ridge, Irving, TX 75038 and may be served with process at that location or through its registered agent, Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 or the CT Corporation System, at 1999 Bryan St., Ste. 900 Dallas, Texas 75201-3136.

176.   On information and belief, the above Verizon Defendants regularly conduct and transact business in the District of Columbia, throughout the United States, and within this District, and as set forth herein, have committed and continue to commit, acts within and outside the District of Columbia and within this District that violate the Sherman and Clayton Acts, including but not limited to tying arrangements, forced sales, exclusive dealing, price fixing, price discrimination, and predatory pricing, all of which suppress competition, manipulate market conditions, and harm consumers and competitors alike.


## JURISDICTION AND VENUE

177.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises under Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 2) and Sections 2, 3, and 7 of the Clayton Act (15 U.S.C. §§ 18, 14). The claims presented by the Plaintiffs and the class they represent involve federal questions relating to antitrust violations.

178.   This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

179. This action is brought under Sections 4 and 6 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) to recover treble damages, equitable relief, costs of suit, and reasonable attorney's fees for violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Section 3 of the Clayton Act (15 U.S.C. § 14). This Court has subject matter jurisdiction for these antitrust violations pursuant to Section 4(a) of the Clayton Act (15 U.S.C. § 15(a)), 28 U.S.C. §§ 1331 and 1338.

180. Furthermore, on information and belief, venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b) and (c) because the Defendants transact business and have agents in this District. A substantial portion of the events giving rise to Plaintiffs' claims occurred in this District, and a significant portion of the affected interstate trade and commerce described herein has been carried out in this District.

181. The Defendants, through their anticompetitive practices and monopolistic conduct, have engaged in activities that directly and substantially affect interstate commerce. The impact of these actions has been felt by Plaintiffs and the class they represent.

## VENUE SUITABILITY AND REQUEST FOR CONSOLIDATION

### A. Venue Suitability

#### 1. Business Operations

182. The Defendants—AT&T, Verizon, T-Mobile, and Deutsche Telekom—conduct extensive operations across the United States, including within the District of Columbia.

183. The Defendants maintain significant business activities in the District of Columbia, including: a) Retail stores, b) Service centers, and c) Network infrastructure.

#### 2. Market Reach

184. A substantial portion of the Defendants' approximately 373 million major carrier subscribers

likely reside within the District of Columbia, making this venue directly relevant to the issues at hand.

### 3. Retail Presence in the District of Columbia.

185.    **AT&T**: With approximately 5,340 retail stores across the United States, there are approximately 5-10 AT&T retail stores in Washington, D.C. **Corporate Satellite Offices**: AT&T maintains a significant presence in Washington, D.C. with corporate satellite offices focused on regulatory affairs, public policy, and government relations, primarily due to its need to interact with policymakers and federal government regulators, including the Federal Communications Commission (FCC).

186.    **Verizon**: With approximately 6,259 retail stores across the United States, there are approximately 8-12 retail stores in Washington, D.C. **Corporate Satellite Offices**: Verizon maintains a significant presence in Washington, D.C. with corporate satellite offices focused on regulatory affairs, public policy, and government relations, primarily due to its need to interact with policymakers and federal government regulators, including the Federal Communications Commission (FCC).

187.    **T-Mobile**: With approximately 6,272 retail stores across the United States, there are approximately 6-10 retail stores in Washington, D.C. **Corporate Satellite Offices**: T-Mobile maintains a significant presence in Washington, D.C. with corporate satellite offices focused on regulatory affairs, public policy, and government relations, primarily due to its need to interact with policymakers and federal government regulators, including the Federal Communications Commission (FCC).

### 4. Jurisdiction and Venue Considerations

188.    Federal district courts have jurisdiction over antitrust cases and class actions, making the District

Court for the District of Columbia an appropriate venue due to:

    *a)*  Significant connections to the alleged violations and their impacts.

    *b)*  The presence of the Defendants' business operations.

    *c)*  A substantial number of affected consumers in the region.

### 5. Jury Trial Considerations

189.    The District Court for the District of Columbia provides a diverse jury pool, with local jurors potentially having a vested interest in the outcome, leading to a more engaged and representative jury.

### B. Request For Consolidation

### 1. Judicial Efficiency

190.    The District Court for the District of Columbia has a vested interest in consolidating related antitrust cases and actions, whether class actions or individual civil matters, before the same court or judge.

### 2. Benefits of Consolidation

191.    Consolidating these cases will provide numerous judicial benefits, including:

    *d)*  The reduction of duplicate proceedings.

    *e)*  Streamlined evidence presentations.

    *f)*  Efficient witness testimonies.

    *g)*  Consistent rulings on similar legal issues and facts.

### 3. Streamlined Discovery Process

192.    These cases involve shared evidence related to the Defendants' practices, which will benefit from a more efficient discovery process, including the scheduling and testimony of expert witnesses.

### 4. Rationale for Consolidation

193.    The rationale for consolidating these cases is robust and well-founded.

194.    **Common Defendants**: These complaints may target the same set of Defendants—AT&T, Verizon, T-Mobile, and Deutsche Telekom. This overlap indicates a shared pattern of alleged anticompetitive behavior, ensuring that the same entities are held accountable for similar violations.

195.    **Similar Violations of Law**: These complaints may allege similar violations of the Sherman Act and the Clayton Act, specifically targeting anticompetitive practices that restrain trade and commerce, as well as mergers and practices that substantially lessen competition. The similarities in the alleged violations underscore a common legal framework and set of facts applicable to both cases.

196.    **Shared Factual Background**: These cases may address similar anticompetitive practices, including:

   *a)*  **Service Bundling and Tying**: These complaints may challenge the Defendants' practice of bundling Wi-Fi calling and mobile data with cellular services, creating barriers to entry and inflating consumer costs.

   *b)*  **Patent Misuse and Intellectual Property Violations**: These complaints may specifically highlight the unauthorized use of a competitor's patented technology by the Defendants, which intersects with broader allegations of anticompetitive behavior in these cases.

### 5.    Strategic Implications

197.    Consolidating these cases will allow for a comprehensive examination of the Defendants' practices and their impact on competition and consumer choice. Given the overlap in the business practices of the Defendants and the similar nature of the legal claims, a unified approach will

facilitate a more thorough and coherent judicial review.

### 6. Efficiency and Consistency

198.  Consolidating the cases offers several advantages:

> *a)* **Reduced Burden on All Parties**: A single consolidated case reduces the burden on the Plaintiffs, Defendants, and the Court by streamlining proceedings and avoiding duplication of efforts.
>
> *b)* **More Efficient Use of Court Resources**: Combining the cases ensures that judicial resources are used more effectively, avoiding the need for multiple sets of proceedings and hearings.
>
> *c)* **Consistent Application of Law**: A consolidated case promotes the consistent application of legal principles, ensuring that similar facts and claims are adjudicated uniformly, thereby reducing the risk of conflicting judgments.

### 7. Appropriate Venue

199.  The District Court for the District of Columbia is an appropriate venue for this Antitrust Class Action and other related antitrust cases. This Court's jurisdiction and expertise in handling complex antitrust matters make it well-positioned to manage a consolidated case involving multiple Defendants and overlapping legal issues.

200.  Consolidating this Antitrust Class Action with other cases is warranted to enhance judicial efficiency, ensure consistent legal outcomes, and address the shared factual and legal issues in a unified manner. This approach will benefit all parties involved and support a fair and comprehensive resolution of the antitrust claims.

### C. Related VoIP-Pal.com Antitrust Action

### 1. Third-Party Litigation Funding Agreement ("Agreement") with the three

**Plaintiffs of this Antitrust Class Action.**

201.   VoIP-Pal's recent transition to the role of sole funder and advisor in this Class Action Antitrust Complaint represents a strategic evolution in its longstanding effort to combat anti-competitive practices within the telecommunications industry. VoIP-Pal has been deeply involved in both this class action lawsuit and its own antitrust complaint against the major telecommunications carriers, alleging violations of the Sherman and Clayton Acts. The decision to streamline the representation into a single "General Subscribers Class," representing approximately 373 million major carrier subscribers, was a deliberate move to strengthen the legal position of the complaint while reducing risks associated with arbitration clauses and class certification challenges.

## 2.   VoIP-Pal's New Role: Complementary, Not Conflicting

202.   The transition of VoIP-Pal to the role of funder and advisor, formalized through the Third-Party Litigation Funding Agreement ("Agreement") with the three plaintiffs, enhances rather than conflicts with ongoing legal strategies. The alignment between the allegations in VoIP-Pal's antitrust complaint and those in this class action lawsuit underscores the complementary nature of this arrangement. Both legal actions are predicated on the Defendants' violations of the Sherman and Clayton Acts, particularly focusing on anti-competitive practices such as the bundling of Wi-Fi calling and texting with cellular calling and texting services and the misuse of intellectual property.

## 3.   Defendants' Conflict Arguments are Legally Flawed

203.   Defendants may argue that VoIP-Pal's dual role as both a plaintiff in its own antitrust complaint and a funder/advisor in the class action creates a conflict of interest. However, this argument can be thoroughly and effectively rebutted:

204.   **Aligned Interests**:

*a)* Both VoIP-Pal's antitrust complaint and the class action target the same Defendants for similar anti-competitive practices.

*b)* This alignment of interests demonstrates that VoIP-Pal's involvement enhances rather than conflicts with the overall legal strategy.

*c)* The shared goal of addressing anti-competitive behavior in the telecommunications industry unifies the two actions.

205. **Transparency and Disclosure**:

*a)* VoIP-Pal's role as a funder and advisor is fully disclosed through the Third-Party Litigation Funding Agreement.

*b)* This transparency aligns with best practices established in cases like Gbarabe v. Chevron Corp., where the court emphasized the importance of disclosure in third-party funding arrangements.

*c)* Full disclosure allows the court and all parties to assess and monitor the arrangement, ensuring fairness and propriety.

206. **Non-Interference in Litigation Strategy**:

*a)* The Third-Party Litigation Funding Agreement explicitly states that VoIP-Pal will not interfere with the litigation strategy of the class action.

*b)* This provision addresses potential concerns about undue influence and maintains the independence of the class action plaintiffs.

*c)* The class action attorneys retain full control over case strategy, settlement decisions, and day-to-day litigation management.

207. **Independent Legal Representation**:

    *a)* The class action plaintiffs are advised to seek independent legal counsel before signing the Third-Party Litigation Funding Agreement.

    *b)* This ensures that their rights and interests are fully protected, mitigating concerns about potential conflicts.

    *c)* Independent counsel can review the agreement and advise on any potential issues, providing an additional layer of protection for the plaintiffs.

208. **Judicial Oversight**:

    *a)* The Court retains the authority to review and approve the funding arrangement, providing an additional layer of protection against any potential conflicts of interest.

    *b)* Judicial oversight ensures that the arrangement complies with all legal and ethical standards.

    *c)* The Court can intervene if any issues arise during the course of the litigation.

209. **Complementary Rather Than Conflicting Actions**:

    *a)* VoIP-Pal's antitrust complaint and the class action are complementary efforts to address the same alleged anti-competitive behavior.

    *b)* The dual approach allows for a more comprehensive challenge to the Defendants' practices, potentially uncovering additional evidence and legal arguments.

    *c)* This synergy benefits both cases without creating conflicting interests.

210. **Separation of Roles**:

    *a)* VoIP-Pal's role as a funder and advisor in the class action is distinct from its role as a plaintiff in its own case.

*b)*  Clear delineation of these roles in the Third-Party Litigation Funding Agreement prevents confusion or overlap.

*c)*  This separation ensures that VoIP-Pal's interests in its own case do not improperly influence the class action.

211.  **Enhanced Resources and Expertise**:

*a)*  VoIP-Pal's involvement provides additional resources and industry expertise to the class action.

*b)*  This contribution strengthens the overall case against the Defendants without compromising the independence of the class action.

*c)*  The sharing of resources and knowledge is a recognized benefit in complex antitrust litigation.

212.  **Precedent for Dual Roles**:

*d)*  As demonstrated in cases like In re Drywall Antitrust Litigation, courts have allowed parties with industry ties to participate in related litigation.

*e)*  VoIP-Pal's dual role is consistent with these precedents, which recognize the value of industry expertise in antitrust cases.

213.  **Ethical Compliance**:

*a)*  The funding arrangement adheres to ethical guidelines for third-party litigation funding.

*b)*  VoIP-Pal commits to maintaining the confidentiality of any sensitive information obtained through its role as funder/advisor.

*c)*  Regular ethical reviews can be conducted to ensure ongoing compliance.

214. **Mutual Benefit Without Prejudice**:

    *a)* The arrangement benefits both VoIP-Pal and the class action plaintiffs without prejudicing the rights of the Defendants.

    *b)* Defendants retain all their legal rights and defenses against both actions.

    *c)* The cooperation between VoIP-Pal and the class action does not create any unfair advantage, but rather promotes efficient and thorough litigation of the antitrust claims.

215. **Flexibility and Ongoing Assessment**:

    *a)* The funding agreement can include provisions for regular review and potential modification if circumstances change.

    *b)* This flexibility allows for ongoing assessment of the arrangement's appropriateness and effectiveness.

    *c)* Any emerging concerns can be promptly addressed, maintaining the integrity of both actions.

216. **Common Legal Interest**:

    *a)* VoIP-Pal and the class action plaintiffs share a common legal interest in holding the same Defendants accountable for similar anti-competitive behaviors.

    *b)* This common interest doctrine supports the legitimacy of information sharing and cooperation between the parties.

217. **Streamlined Representation**:

    *a)* The consolidation into a single "General Subscribers Class" strengthens the legal position and reduces risks associated with arbitration clauses and class certification challenges.

*b)* This streamlined approach enhances judicial efficiency without compromising the interests of individual plaintiffs.

218. **Preemptive Disclosure**:

*a)* By proactively addressing VoIP-Pal's dual role in the pleadings, the plaintiffs demonstrate transparency and good faith.

*b)* This preemptive approach allows the court to address any potential concerns upfront, reducing the risk of later challenges.

219. **Enhanced Discovery**:

*a)* The dual approach may lead to more comprehensive discovery, potentially uncovering additional evidence of anti-competitive practices.

*b)* This broader scope of discovery benefits both VoIP-Pal's case and the class action without creating conflicts.

220. **Cost-Effective Litigation**:

*a)* Shared resources and aligned strategies can lead to more cost-effective litigation for all parties involved.

*b)* This efficiency serves the interests of justice by allowing for a more thorough pursuit of the antitrust claims.

221. **Increased Likelihood of Success**:

*a)* The combined expertise, resources, and legal approaches increase the overall likelihood of a favorable outcome in addressing the alleged anti-competitive practices.

*b)* This improved chance of success benefits the broader goal of maintaining fair competition in the telecommunications industry.

### 4.  Precedents

222.  **In re Drywall Antitrust Litigation (E.D. Pa. 2016):**

    *a)* Commonality: The court upheld the involvement of plaintiffs with close ties to industry groups supporting the litigation.

    *b)* Relevance to VoIP-Pal: Supports VoIP-Pal's dual role as both a plaintiff and funder, emphasizing that aligned interests and transparent agreements do not constitute a conflict.

223.  **In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation (E.D.N.Y. 2019):**

    *a)* Commonality: The court allowed plaintiffs with prior contractual relationships to entities involved in the litigation to continue their involvement.

    *b)* Relevance to VoIP-Pal: Reinforces the legitimacy of VoIP-Pal's role as both a plaintiff and funder, highlighting the importance of transparency and independent legal advice.

224.  **United States v. Apple Inc. (e-books case) (2d Cir. 2013):**

    *a)* Commonality: While not directly about third-party funding, this case demonstrates the court's support for collaborative efforts to address anti-competitive practices.

    *b)* Relevance to VoIP-Pal: Supports the cooperation between VoIP-Pal and the class action plaintiffs in challenging alleged monopolistic behaviors.

225.  **California v. American Stores Co. (1990):**

    *a)* Commonality: The Supreme Court upheld the right of a private plaintiff to challenge anti-competitive mergers under the Clayton Act, even with concurrent actions.

      *b)* Relevance to VoIP-Pal: Validates VoIP-Pal's dual role as both a plaintiff and a funder, provided its actions align with the broader goal of combating anti-competitive practices.

**226.** **Gbarabe v. Chevron Corp. (N.D. Cal. 2016):**

      *a)* Commonality: The court allowed third-party funding in a class action, emphasizing the importance of disclosure and non-interference with litigation strategy.

      *b)* Relevance to VoIP-Pal: Supports VoIP-Pal's role as a funder in the class action, highlighting the acceptability of third-party funding when properly disclosed and managed.

### 5. Conclusion

**227.** The comprehensive analysis presented above, including both the precedent support and the rebuttal of potential conflict arguments, demonstrates that VoIP-Pal's dual role as both a plaintiff in its own antitrust complaint and a funder/advisor in the class action not only avoids conflicts of interest but actually enhances the overall legal strategy against the Defendants. The arrangement is transparently disclosed, ethically compliant, and subject to both independent legal scrutiny and judicial oversight.

**228.** The alignment of interests, clear separation of roles, and numerous safeguards effectively neutralize any potential conflict arguments. The arrangement optimizes resources, leverages shared knowledge, and increases the likelihood of a favorable outcome in addressing the alleged anti-competitive practices.

**229.** Furthermore, the precedents cited strongly support the legitimacy of such dual roles in antitrust litigation, recognizing the value of industry expertise and aligned interests in complex cases. The court's ability to review and approve the funding arrangement provides an additional safeguard

against potential conflicts.

230.   VoIP-Pal's involvement strengthens the legal challenge against the Defendants without compromising the integrity of either the class action or its own antitrust complaint. This arrangement represents a strategic and ethically sound approach to addressing alleged anti-competitive practices in the telecommunications industry, fully aligned with legal precedents and best practices in complex antitrust litigation. The potential benefits to the pursuit of justice and fair competition far outweigh any theoretical concerns about conflicts, making this dual role not just acceptable, but advantageous to the overall legal process.

## STATEMENT OF THE CASE

231.   This antitrust class action is brought on behalf of the **General Subscribers Class**: Approximately 373 million major carrier subscribers who have experienced inflated prices, reduced service quality, or other anticompetitive harms due to the Defendants' practices.

232.   The Defendants—AT&T Inc., T-Mobile US, Inc., Deutsche Telekom AG, and Verizon Communications Inc.—have systematically violated antitrust laws through the following practices:

- **Tying Arrangements and Forced Bundling**: In violation of Sherman Act §1 and Clayton Act §3, the Defendants bundled Wi-Fi calling with cellular services, thereby restricting consumer choice and coercing customers into purchasing bundled services they may not need.

- **Monopolization of Wi-Fi Calling and Mobile Data Markets**: In violation of Sherman Act §2 and Clayton Act §7, the Defendants engaged in monopolistic practices, including

predatory pricing, exclusive dealing, and erecting barriers to entry, to maintain their dominance in the market.

- **Price-Fixing and Predatory Pricing**: The Defendants violated Sherman Act §1 and Clayton Act §2 by engaging in uniform pricing strategies and offering Wi-Fi calling at zero cost, despite associated expenses, to distort the market and eliminate competition

- **Group Boycott and Concerted Refusal to Deal**: In violation of Sherman Act §1, the Defendants collectively refused to offer standalone Wi-Fi calling or mobile data services, thereby preventing competition and maintaining their oligopolistic control.

- **Fraudulent Misrepresentation**: The Defendants engaged in deceptive practices by marketing "free" Wi-Fi calling while concealing the true costs and limitations, violating both Sherman Act §§1 and 2.

233.   These anticompetitive practices have caused significant financial harm, market distortion, inflated prices, and reduced consumer choice.

### A. Legal Precedents

234.   Legal precedents supporting these claims include:

*a)* *Eastman Kodak Co. v. Image Technical Services, Inc*., 504 U.S. 451 (1992)*:* Established that tying arrangements that violate antitrust laws are illegal.

*b)* *United States v. Microsoft Corp*., 253 F.3d 34 (D.C. *2001):* Found that tying practices designed to preserve market dominance are unlawful.

*c)* *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985)*:* Demonstrated that conduct harming competition constitutes a violation of antitrust laws.

     *d)*  Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209 (1993):

          Addressed the illegality of predatory pricing as an antitrust violation.

235.  These cases provide a solid legal foundation for the claims presented in this Antitrust Class Action, highlighting the Defendants' systematic violations of antitrust laws.

### B. FTC and DOJ Positions

236.  Both the Federal Trade Commission (FTC) and the Department of Justice (DOJ) have consistently opposed anticompetitive practices, underscoring the importance of maintaining competitive markets free from illegal bundling and predatory pricing strategies that harm consumers and stifle innovation. Their positions reinforce the necessity for judicial intervention in this case to restore fair competition and protect consumer interests.

## HIGH BAR OF TWOMBLY

237.  In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), the Supreme Court established a stringent standard for antitrust pleadings under the Sherman Act, requiring sufficient factual matter to suggest that an agreement was made. The allegations in this case meet and exceed the Twombly standard, with detailed claims that AT&T, Verizon, T-Mobile, and Deutsche Telekom —who collectively control over 97% of the U.S. mobile market—engaged in collusion through uniform practices of bundling Wi-Fi calling with cellular services and offering Wi-Fi calls at zero cost. This conduct restricts market entry, harms competition, and demonstrates not only parallel behavior but also clear indicators of collusion.

### A. Factual Pleadings

#### 1. Parallel Conduct and Plus Factors

238.  **Simultaneous Actions:** The Defendants uniformly bundle Wi-Fi calling with cellular services,

offering Wi-Fi at no additional cost. This practice restricts competition and limits consumer choice, evidencing parallel conduct that signals coordinated behavior.

239. **Tying and Forced Sales**: The Defendants compel consumers to purchase bundled services by tying Wi-Fi calling to cellular services, thereby denying consumers the option of standalone Wi-Fi calling in clear violation of antitrust laws.

240. **Increased Costs for Consumers**: The refusal to offer standalone Wi-Fi calling inflates consumer costs, placing an undue financial burden on consumers.

241. **Predatory Pricing**: By offering Wi-Fi calling at zero cost despite the associated expenses, the Defendants engage in predatory pricing, which is designed to eliminate competition and solidify their market control.

### 2. Motivations Against Self-Interest

242. **Market Concentration:** The Defendants' overwhelming control over the mobile market creates a conducive environment for collusion, reducing the level of competition significantly.

243. **Barriers to Entry**: The Defendants' dominance, coupled with their pricing strategies, erects substantial barriers for new competitors, ensuring their continued market dominance.

244. **Economic Evidence:** The Defendants' decision to price Wi-Fi calling at zero, despite it incurring costs, demonstrates a calculated strategy to suppress competition rather than a legitimate business justification.

### 3. Tacit Collusion and Industry Structure

245. **Opportunities to Collude**: The Defendants likely engaged in behind-the-scenes coordination to maintain their anticompetitive practices, benefiting from their market dominance.

246. **Market Behavior**: The consistent bundling and pricing strategies employed by the Defendants suggest a coordinated effort to prevent the emergence of a standalone Wi-Fi calling market,

further entrenching their monopolistic control.

247. **Deceptive Practices**: The Defendants mislead consumers by presenting their bundled pricing strategy as advantageous, while in reality, it stifles competition and limits consumer choice.

## B. Precedent Cases Supporting Plaintiffs' Factual Pleadings

248. *In re Urethane Antitrust Litigation*, 768 F.3d 1245 (10th Cir. 2014): Successfully established allegations of price-fixing through parallel conduct and coordinated price increases, underscoring the importance of economic evidence and industry behavior in proving collusion.

249. *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 267 F.R.D. 583 (N.D. Cal. 2009): Allowed price-fixing and market allocation claims to advance based on uniform price increases, highlighting the relevance of consistent pricing strategies as evidence of antitrust violations.

250. *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, 338 F. Supp. 3d 404 (E.D. Pa. 2019): Demonstrated that claims of price-fixing could meet the Twombly standard through well-documented parallel conduct combined with additional supporting factors.

251. *In re Automotive Parts Antitrust Litigation*, 27 F. Supp. 3d 612 (E.D. Mich. 2011): Established that price-fixing and bid-rigging allegations satisfied the Twombly standard through evidence of coordinated conduct, reinforcing the legal framework applicable to this case.

## C. Meeting The High Bar of Twombly

252. The Plaintiffs' allegations extend beyond mere parallel conduct, satisfying the rigorous standard set by Twombly for plausibility. The uniform practices of bundling Wi-Fi calling with cellular services, despite the associated costs, demonstrate coordinated behavior indicative of collusion. The Defendants' collective control over 97% of the U.S. mobile market creates an environment ripe for collusion, and the Plaintiffs have provided detailed, economically supported accounts of this conduct. Post-Twombly cases, such as In re Urethane Antitrust Litigation and In re TFT-

LCD Antitrust Litigation, validate the sufficiency of these pleadings, justifying the case's advancement to the discovery phase and a full consideration of its merits.

## STANDING FOR THE CLASS AS PER ARTICLE III AND THE FEDERAL ANTITRUST LAWS OF THE SHERMAN AND CLAYTON ACTS

### A. Standing Of the Class Under Article III

253. **General Subscribers Class**:

   a) **Injury in Fact**: Approximately 373 million major carrier subscribers have been impacted by higher prices and limited service options as a result of the Defendants' monopolistic conduct.

   b) **Causation**: The inflated costs and reduced choices are a direct outcome of the Defendants' exclusionary practices in the telecommunications market.

   c) **Redressability**: Judicial intervention through injunctions and damages will address these overpayments and help restore competitive market conditions.

### B. Federal Standing of the Class

254. The Defendants' conduct violates critical provisions of both the Sherman and Clayton Acts:

#### 1. Sherman Act Violations

255. **Section 1**: The Defendants engaged in illegal tying and forced bundling of Wi-Fi calling services with cellular services, thereby restricting competition.

256. **Section 2**: The Defendants have exploited their market dominance through monopolistic practices, including predatory pricing and exclusionary tactics, to suppress competition.

#### 2. Clayton Act Violations

257. **Section 2**: The Defendants' price discrimination practices, particularly the zero-cost model for

Wi-Fi calling, distort the market and harm competition.

258.   **Section 3**: The Defendants' exclusive dealing arrangements prevent smaller competitors from entering the market, substantially lessening competition.

259.   **Section 7**: The Defendants' mergers and acquisitions have further entrenched their monopolistic control, creating additional barriers to market entry and lessening competition.

260.   The Plaintiffs have clearly demonstrated the requisite standing under Article III of the class and have substantiated their claims of violations under the Sherman and Clayton Acts. The economic losses, inflated prices, and diminished market competition suffered by the Plaintiffs are directly attributable to the Defendants' anticompetitive conduct. The Court's intervention is imperative to restore competitive market conditions, provide compensation for the harm inflicted, and prevent future violations of antitrust laws.

## ARBITRATION CLAUSE IN SUBSCRIBER AGREEMENTS IS UNENFORCEABLE

261.   The Defendants, including major telecommunications carriers, incorporate mandatory arbitration clauses within their customer contracts. These clauses are designed to compel subscribers to resolve disputes through arbitration, effectively barring them from pursuing litigation in court. However, given the Defendants' bad faith actions, anticompetitive conduct, and deceptive practices, these arbitration clauses are rendered unenforceable.

### A.  Invalidation of Arbitration Clauses

#### 1.  Bad Faith and Anticompetitive Conduct

262.   The Defendants, who dominate over 97% of the mobile telephony market, have engaged in bad faith by misleading subscribers regarding the true costs associated with Wi-Fi calling. This lack of transparency breaches the principle of good faith inherent in contractual agreements, thereby

invalidating the arbitration clauses. Furthermore, their monopolistic behavior, including price-fixing and exclusionary tactics, violates Sections 1 and 2 of the Sherman Act, as well as Sections 2, 3, and 7 of the Clayton Act.

### 2. Deceptive Conduct

263.    The Defendants have misrepresented Wi-Fi calling as a free service, while covertly imposing hidden costs on subscribers through bundled service plans. This deception shifts financial burdens onto consumers while the Defendants reap operational savings without passing any benefits to the subscribers. Such conduct fundamentally undermines the validity of the arbitration clauses.

### 3. Fraudulent Misrepresentation

264.    By falsely promoting Wi-Fi calling as cost-free and concealing the true financial implications, the Defendants have engaged in fraudulent misrepresentation. Arbitration clauses embedded in contracts obtained through deceitful practices are invalid, as subscribers were misled into agreeing to these terms.

### 4. Breach of Duty of Disclosure

265.    The Defendants have failed to disclose critical information regarding the actual costs of Wi-Fi calling, violating their duty of good faith and fair dealing. This breach further invalidates the arbitration clauses, as subscribers were not fully informed at the time of agreement.

### B. Relevant Court Rulings

266.    In **Achey v. Cellco Partnership (Verizon Wireless)**, involving one of the same Defendants in this case, the court ruled that Verizon's arbitration clause was unenforceable due to its unconscionable provisions, including restrictive notification requirements and limitations on damages. This ruling highlights how arbitration clauses can be invalidated when they unfairly restrict consumer rights.

267. This precedent is particularly significant in the current case, where the Defendants' intentional deception and anticompetitive practices further justify the invalidation of these arbitration clauses. Given Verizon's history and the context of this case, the Plaintiffs' claims merit full adjudication in the court system, ensuring that the Defendants' conduct is thoroughly examined and justice is appropriately served.

## CLASS ACTION ALLEGATIONS AND CERTIFICATION

268. Plaintiffs seek class certification under Rule 23 of the Federal Rules of Civil Procedure for the class harmed by the Defendants' anticompetitive conduct, fraudulent misrepresentation, and deceptive practices. The proposed class meets the required certification criteria, supported by directly relevant legal precedents.

### A. Certification Criteria with Direct Legal Support

269. **Numerosity**: The class includes thousands or millions of members, making individual lawsuits impractical. This satisfies the numerosity requirement, as established in *Amchem*.

270. **Commonality**: Common legal and factual questions, such as Defendants' fraudulent misrepresentation, antitrust violations, and financial harm, predominate. This mirrors the commonality principle highlighted in *Dukes*.

271. **Typicality**: The claims of the named Plaintiffs reflect the uniform impact of Defendants' conduct across the class, aligning with the standards set in *Comcast*.

272. **Adequacy**: Plaintiffs and their counsel can adequately protect the interests of the class, consistent with the adequacy requirement recognized in *Tyson Foods*.

273. **Superiority**: A class action is superior to individual litigation for efficiently addressing the widespread harm caused by Defendants' conduct, as supported by *Amchem* and *Comcast*.

### B.  Class Definition and Link to Precedents

274.  General Subscribers Class. **Precedent**: *Comcast Corp. v. Behrend* (2013).  The approximately 373 million major carrier subscribers suffered uniform financial harm due to Defendants' deceptive practices, warranting a class-wide resolution of their claims, similar to *Comcast*.

### C.  Request for Certification and Judicial Action

275.  Given the direct harm to the Plaintiffs and each of the class members through significant economic losses, fraudulent misrepresentation, and antitrust violations, this action should be certified as a class action under Rule 23. The Plaintiffs have demonstrated that the class meets the numerosity, commonality, typicality, and adequacy requirements, with strong precedent support for certification. Judicial certification will ensure that all affected parties receive redress and that Defendants are held accountable for their unlawful conduct.

### D.  Inclusion of Deutsche Telekom AG in Antitrust Complaints: A Necessary Component

276.  The Plaintiffs' decision to include Deutsche Telekom AG as a Defendant alongside AT&T, Verizon, and T-Mobile US is both justified and essential for a comprehensive examination of the alleged anticompetitive practices in the U.S. telecommunications market. The rationale for this inclusion is as follows:

- **Substantial Ownership Stake:** Deutsche Telekom AG holds a majority ownership stake in T-Mobile US. This controlling interest provides Deutsche Telekom with considerable influence over T-Mobile's strategic decisions and operational policies.

- **Board Representation:** The Board of Deutsche Telekom AG (DT) consists of seven members, while T-Mobile US, Inc. (TM) has thirteen. Notably, four key members—

Thorsten Langheim, Dominique Leroy, Srini Gopalan, and Christian P. Illek—serve on both boards, indicating significant influence from the parent company on T-Mobile's operations. Additionally, Timotheus Höttges, who is the Chief Executive Officer of Deutsche Telekom, also serves as the Chairman of T-Mobile's Board, further consolidating the strong management and strategic control exercised by the parent company over its subsidiary.

- **Strategic Influence:** Through its substantial ownership and significant board representation, Deutsche Telekom plays a critical role in shaping T-Mobile's market behavior, directly impacting competition and consumer costs.

- **Legal Basis for Inclusion:** Including Deutsche Telekom AG in the complaint is legally justified due to:

  o **Market Impact:** Deutsche Telekom's significant ownership stake in T-Mobile influences the company's market practices and competitive strategies.

  o **Corporate Governance:** Deutsche Telekom's board representation grants it direct authority over key corporate decisions, particularly in areas such as service bundling and pricing.

277. Furthermore, it is important to note that Deutsche Telekom AG's business model extends beyond its involvement with T-Mobile US. In Germany, Deutsche Telekom operates under a similar framework where Wi-Fi calling is tied to cellular services, and mobile data is bundled with cellular plans, without offering standalone options. This practice reflects a consistent strategy of tying and bundling services.

278. Deutsche Telekom AG's MVNOs across Europe also adhere to this restrictive model. These MVNOs do not offer Wi-Fi calling or mobile data as standalone services, maintaining the same

bundling practices observed in Deutsche Telekom AG's core operations.

279.    This consistent approach across multiple markets reinforces the necessity of including Deutsche Telekom AG in the antitrust complaints. It demonstrates a pattern of anticompetitive behavior that spans multiple markets and affects a broad spectrum of consumers).


## PIERCING THE CORPORATE VEIL AND DIRECTORS' LIABILITY

280.    This action confronts the Defendants' systematic fraudulent misrepresentation, deceit, and anticompetitive practices concerning Wi-Fi calling and mobile data services. These actions constitute clear violations of key antitrust laws, specifically Sections 1 and 2 of the Sherman Act and Sections 2, 3, and 7 of the Clayton Act. Due to the deliberate and pervasive nature of these violations, it is imperative to pierce the corporate veil and hold the Directors personally accountable.

### A.  Anticompetitive Conduct and Fraudulent Misrepresentation

281.    The Defendants, controlling over 97% of the U.S. mobile telecommunications market, have leveraged their market dominance to engage in anticompetitive practices, including the following.

282.    **Tying and Forced Sales:** The Defendants violated Sherman Act §1 and Clayton Act §3 by bundling Wi-Fi calling services with cellular services, coercing consumers into purchasing unwanted services.

283.    **Monopolization:** The Defendants breached Sherman Act §2 by strategically preventing competition and maintaining dominance over the Wi-Fi calling market.

284.    **Price Fixing and Predatory Pricing:** The Defendants engaged in price manipulation in violation of Sherman Act §1, offering Wi-Fi calling at no additional cost while charging for cellular services, thereby misleading subscribers into believing they were benefiting financially.

285. **Unlawful Mergers and Acquisitions:** The Defendants breached Clayton Act §7 by consolidating market control through acquisitions, eliminating potential competitors, and erecting barriers to market entry.

### B. Justification for Piercing the Corporate Veil

286. The Directors of the Defendant corporations were not only aware of but actively participated in these fraudulent and anticompetitive practices. Their direct involvement in these actions warrants piercing the corporate veil due to:

287. **Unity of Interest and Ownership:** The Directors' participation on these fraudulent and anticompetitive practices appears as if the Directors operated the corporations as mere extensions of their personal interests, aligning corporate actions with personal gain, and effectively using the corporations as alter egos.

288. **Fraudulent Intent:** The Directors' participation on these fraudulent and anticompetitive practices appears as if the Directors employed the corporate structure to perpetrate fraud, mislead consumers, and violate antitrust laws, specifically under Sherman Act §§1 and 2 and Clayton Act §§2, 3, and 7.

289. **Unjust Enrichment:** Allowing the corporate veil to remain intact would enable the Directors to unjustly retain personal profits derived from their fraudulent and anticompetitive activities, resulting in a gross miscarriage of justice.

### C. Precedent Cases

290. *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134 (1968): Established that the corporate veil could be pierced to hold individual directors and officers liable for antitrust violations, including tying arrangements and monopolistic practices under Sherman Act §§1 and 2 and Clayton Act §3.

291. *United States v. Wise*, 370 U.S. 405 (1962): Demonstrated that corporate officers could be personally liable under Sherman Act §1 if they knowingly engaged in illegal antitrust activities.

292. *Basic Inc. v. Levinson,* 485 U.S. 224 (1988): Highlighted that the omission of material facts, such as the true costs of Wi-Fi calling, can constitute fraud, supporting claims under Sherman Act §2.

293. *In re Caremark International Inc. Derivative Litigation,* 698 A.2d 959 (Del. Ch. 1996): Established the duty of directors to implement monitoring systems to ensure compliance with legal obligations. The failure to do so, as evidenced in this case, represents a breach of fiduciary duties under Sherman Act §2 and Clayton Act §7.

### D. Weighing the Evidence

294. The Directors' active involvement in fraudulent, deceptive, and anticompetitive practices justifies piercing the corporate veil. Their conduct, which directly violates Sherman Act §§1 and 2 and Clayton Act §§2, 3, and 7, necessitates holding them personally liable. The Court should impose liability for all damages incurred by the Plaintiffs, including both compensatory and punitive damages, to ensure justice is served, market integrity is restored, and future corporate misconduct is effectively deterred.


## COMPARATIVE ANALYSIS: UNITED STATES V. GOOGLE LLC AND UNITED STATES V. MICROSOFT CORP, AND THE COUNTS

### United States v. Google LLC, United States v. Microsoft Corp., and this Antitrust Class Action

### A. Overview of Cases

295. **This Antitrust Class Action**: Monopolistic practices in telecom services through tying arrangements and exclusionary conduct.

i.) **Defendants**: Major telecommunications carriers (AT&T, Verizon, T-Mobile, and Deutsche Telekom).

ii.) **Key Issue**: Tying Wi-Fi calling to cellular and texting services, preventing the offering of standalone Wi-Fi calling.

iii.) **Violations**:

- **Sherman Act**: Section 1 (Restraint of Trade), Section 2 (Monopolization).

- **Clayton Act**: Section 3 (Exclusive Dealing), Section 7 (Mergers and Acquisitions

296. **United States v. Google LLC**: Monopoly maintenance through exclusionary contracts and tying practices in digital markets.

i.) **Defendant**: Google.

ii.) **Key Issue**: Tying Google Search and Chrome to Android OS, exclusive contracts.

iii.) **Violations**:

- **Sherman Act**: Section 1 (Restraint of Trade), Section 2 (Monopolization).

297. **United States v. Microsoft Corp**: Monopolistic practices through tying and exclusionary conduct in software markets.

i.) **Defendant**: Microsoft.

ii.) **Key Issue**: Tying Internet Explorer to Windows OS.

iii.) **Violations**:

- **Sherman Act**: Section 1 (Restraint of Trade), Section 2 (Monopolization).

### B. Comparative Analysis

#### 1. Scope of Anticompetitive Conduct

298. **Wi-Fi Calling Class Action**: Encompasses a broader array of anticompetitive practices,

including tying, exclusive dealing, and anticompetitive mergers.

299. **Google**: Focuses on exclusionary contracts and tying in digital markets.

300. **Microsoft**: Primarily centered on tying and exclusionary practices in software distribution.

### 2. Market Power Abuse

301. **Wi-Fi Calling Class Action**: Exploits control over cellular infrastructure to dominate the emerging Wi-Fi calling market.

302. **Google**: Leverages its search engine dominance to control adjacent markets like mobile OS and digital advertising.

303. **Microsoft**: Utilized its OS monopoly to dominate the web browser market.

### 3. Consumer Impact

304. **Wi-Fi Calling Class Action**: Directly impacts consumer choice in essential communication services, leading to inflated costs and limited options.

305. **Google**: Affects consumer access to digital services and information.

306. **Microsoft**: Restricted consumer choice in web browsers and software applications.

### 4. Innovation Suppression

307. **Wi-Fi Calling Class Action**: Stifles the development of standalone Wi-Fi calling technologies, hindering innovation.

308. **Google**:  Restricts innovation in search technologies and mobile applications.

309. **Microsoft**: Hampered browser innovation and the development of web standards.

### 5. Market Structure Effects

310. **Wi-Fi Calling Class Action**: Affects the structure of both cellular and internet-based communication markets, leading to increased consolidation.

311. **Google**: Influences the digital advertising, search, and mobile OS markets.

312. **Microsoft**: Impacted the PC operating system and web browser markets.

### 6. Legal Precedent Significance

313. **Wi-Fi Calling Class Action**: Has the potential to set new precedents in telecom antitrust law, particularly concerning emerging technologies.

314. **Google**: Establishes modern precedents for antitrust enforcement in digital markets.

315. **Microsoft**: Provided foundational precedents for antitrust actions in software and tech industries.

### 7. Regulatory Intersections

316. **Wi-Fi Calling Class Action**: Engages with FCC regulations and broader telecom laws.

317. **Google**: Involves considerations of digital privacy and data protection.

318. **Microsoft**: Focused on software and OS regulations.

### C. Weighing the Evidence

319. An intellectual property licensing business recently filed yet another suit against AT&T, Verizon, T-Mobile, and Deutsche Telekom, this time accusing the Defendants of wielding their market power and conspiring to refuse to license innovative 4G and 5G wireless communications system technology. Celerity IP LLC, along with patent owners Asus Technology Inc. and Innovative Sonic Ltd., said it had tried to work with AT&T, Verizon, T-Mobile, and Deutsche Telekom to license patents covering the technology. However, the Defendants refused, according to the complaint filed in Texas state court. The complaint states that "[i]nstead, the service providers have entered into a contract, combination or conspiracy to unreasonably restrain trade and impose a group boycott on Plaintiffs."[2]

320. Celerity, Innovative, and Asus have already filed a myriad of patent infringement claims against

---

[2] The case is Celerity IP LLC et al. v. AT&T Corp. et al., case number unknown, in the District Court for Dallas County, Texas. See also https://www.law360.com/articles/1859384/.

the telecommunications companies. In six separate suits filed in Texas federal court, Celerity, Innovative, and Asus claimed that they had tried to grant all three companies fair, reasonable, and nondiscriminatory licenses to use the patents in question. However, the Defendants declined the offer and continued to use methods covered by the patents without authorization.

321. The Defendants here also have entered into a contract, combination, or conspiracy to unreasonably restrain trade and impose a group boycott on any competitor with patents, technology, and know-how related to Wi-Fi calling and texting technologies. The Defendants have continued to use patents, technologies, and know-how without authorization. This Antitrust class action is also different and more egregious than the patent disputes of Celerity, Innovative, and Asus because the Defendants anticompetitive and anticonsumer conduct has broader implications beyond intellectual property disputes, directly the Defendants' own subscribers. The Defendants have conspired to monopolize technology and know-how, injuring the Defendants' own subscribers.

322. **Breadth of Violations**: This Antitrust Class Action is particularly significant for its alleged violations across both the Sherman and Clayton Acts. Unlike the Google and Microsoft cases, which primarily focused on Sherman Act violations, this case encompasses a wider range of anticompetitive practices, including exclusive dealing and potentially anticompetitive mergers.

323. **Evolving Market Dynamics**: This Antitrust Class Action represents a crucial phase of antitrust enforcement in the telecommunications industry. As traditional telecom providers grapple with the convergence of internet-based communication technologies, their attempts to bundle services and maintain market dominance are under increased scrutiny. The Antitrust Class Action could establish critical precedents that will shape the regulatory landscape for telecom and related industries in the future.

324. **Consumer Welfare and Market Structure**: The direct impact on consumer choice in essential communication services could resonate more strongly with courts and regulators. The case emphasizes how the bundling practices of telecom giants stifle competition, limit consumer options, and inflate costs—issues central to antitrust law. The outcome of this case could have significant implications not just for the telecommunications sector but for how emerging technologies are integrated into existing market structures.

325. While the Google and Microsoft antitrust cases were landmark decisions that set important precedents in the digital and software markets, this Antitrust Class Action has the potential to be even more consequential. Its broader scope of alleged violations and its focus on critical communication infrastructure position it as a pivotal case that could redefine antitrust law's application in the telecommunications industry. The outcome may influence not only the future of consumer communication services but also determine the adaptability of antitrust laws to the rapid technological advancements reshaping global markets.

## **THE COUNTS**

326. This case involves anticompetitive conduct and unauthorized use of technology by the Defendants, violating the Sherman and Clayton Acts. Plaintiffs and the Class members have suffered due to tying arrangements, price discrimination, monopolistic practices, and conspiracies that restrain trade in the mobile voice calling and text messaging markets. The Defendants have engaged in two forced bundles: (1) Wi-Fi calling tied to cellular calling and texting, and (2) mobile data bundled with cellular calling and texting. These practices have caused significant economic harm to the Plaintiffs, the General Subscribers Class, and potentially additional consumers in the marketplace.

### A. COUNT I: Monopolization and Attempts to Monopolize (Sherman Act §2)

327. Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

328. **Monopoly Power**: The Defendants possess monopoly power in the Wi-Fi calling and mobile data markets, stemming from their dominant market share and control over critical infrastructure.

329. **Exclusionary Conduct**:  The Defendants maintain and reinforce their monopoly power through exclusionary practices, including tying, forced sales, and predatory pricing. These actions are designed to eliminate competition and solidify their market dominance, constituting a clear violation of Sherman Act §2. **Precedent Case**: *United States v. Grinnell Corp.,* 384 U.S. 563 (1966). The Supreme Court established that monopolization requires both monopoly power in the relevant market and the willful acquisition or maintenance of that power. The Defendants' actions in this case align with this precedent by maintaining monopoly power through anticompetitive practices.

### B. COUNT II: Tacit Collusion (Clayton Act §7)

330. Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

331. **Monopoly Power**: The Defendants' significant market share allows them to engage in tacit collusion, coordinating actions without explicit agreements, which leads to reduced competition and consumer harm.

332. **Tacit Collusion**: The Defendants' coordinated pricing and service strategies, without explicit agreement, and effectively restrained trade, violating Clayton Act §7. **Precedent Case**: *American Tobacco Co. v. United States,* 328 U.S. 781 (1946). The Supreme Court found that tacit collusion among major market players can violate antitrust laws. The Defendants' coordinated efforts to avoid competition in this case mirror the collusion identified in the American Tobacco case.

### C.  COUNT III: Restraint of Trade (Sherman Act §1)

333.   Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

334.   **Monopoly Power**: The Defendants leverage their market control to engage in practices that unreasonably restrain trade.

335.   **Contracts and Conspiracies**: The Defendants have entered into agreements that stifle competition and limit consumer choice, in direct violation of Sherman Act §1. **Precedent Case**: *Northern Pacific Railway Co. v. United States,* 356 U.S. 1 (1958): The Supreme Court held that agreements unreasonably restraining trade are per se violations of the Sherman Act. The Defendants' bundling practices in this case are consistent with the restraints on trade identified in Northern Pacific

### D.  COUNT IV: Tying (Clayton Act §3)

336.   Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

337.   **Monopoly Power**: The Defendants exploit their market dominance to force consumers into purchasing bundled services.

338.   **Tying and Tied Products**: The Defendants have tied Wi-Fi calling to cellular services and mobile data to cellular calling, restricting consumer choice and violating Clayton Act §3. **Precedent Case**: *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2 (1984). The Supreme Court ruled that tying arrangements, where the sale of one product is conditioned on the purchase of another, can violate antitrust laws. The Defendants' practices in this case fit within the illegal tying framework established by Jefferson Parish.

### E.  COUNT V: Forced Sale (Clayton Act §3)

339.   Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

340.   **Monopoly Power**: The Defendants coerce consumers into purchasing unwanted services through

forced bundling.

341.   **Forced Sales**: Their bundling practices compel consumers to buy more than they need, violating Clayton Act §3. **Precedent Case**: *Standard Oil Co. of California v. United States*, 337 U.S. 293 (1949). The Supreme Court found that forcing consumers into purchasing additional products through monopolistic power constitutes a violation of the Clayton Act. The Defendants' forced bundling practices are analogous to those condemned in Standard Oil.

### F.  COUNT VI: Price Fixing (Clayton Act §2)

342.   Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

343.   **Monopoly Power**: The Defendants conspire to set prices for bundled services, thereby harming market competition.

344.   **Price Fixing**: The Defendants' coordinated pricing strategies lead to inflated prices, violating Clayton Act §2. **Precedent Case**: *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150 (1940). The Supreme Court ruled that price fixing is per se illegal under the Sherman Act. The Defendants' coordinated pricing strategies in this case align with the framework of illegal price fixing established by Socony-Vacuum.

### G.  COUNT VII: Predatory Pricing (Clayton Act §2)

345.   Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

346.   **Monopoly Power**: The Defendants engage in predatory pricing to eliminate competitors and consolidate their market dominance.

347.   **Below-Cost Pricing**: They offer services at no additional cost to drive out competition, violating Clayton Act §2. **Precedent Case**: *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209 (1993). The Supreme Court defined predatory pricing and its implications under the Sherman Act, establishing that pricing below cost to eliminate competitors is unlawful. The

Defendants' practices in this case are consistent with the predatory pricing identified in Brooke Group.

### H.  Weighing the Evidence

348.    The Defendants' anticompetitive conduct, including compulsory bundling, predatory pricing, and price fixing, clearly violates multiple provisions of both the Sherman and Clayton Acts. The overwhelming evidence justifies not only treble damages but also strong injunctive relief to restore competition and prevent future violations. The Defendants' actions, supported by the directly applicable precedent cases, underscore the necessity of legal intervention to correct these injustices and protect consumer welfare

### I.   Comparative Analysis of Seven Counts: This Antitrust Class Action, The Google Case, and The Microsoft Case

#### 1.   Count I: Monopolization (Sherman Act §2)

349.    **Google Case**: Google maintained a monopoly through anticompetitive means, including exclusive agreements that foreclosed competition.

350.    **Microsoft Case**: Microsoft maintained its monopoly in the PC operating systems market through exclusionary practices.

351.    **Antitrust Class Action**: The monopolistic practices in all three cases demonstrate systemic abuse of market dominance. However, the class action case highlights broader coordination among major telecom players, indicating more extensive antitrust violations.

#### 2.   Count II: Tacit Collusion (Clayton Act §7)

352.    **Google Case**: The court focused on exclusionary practices rather than explicit tacit collusion.

353.    **Microsoft Case**: While not explicitly addressing tacit collusion, the Microsoft case involved coordinated actions to suppress competition.

354. **Antitrust Class Action**: The recognition of exclusionary practices in both Google and Microsoft cases supports the claims of tacit collusion in the Wi-Fi Calling Class Action. The Defendants' coordinated efforts to maintain market dominance echo the monopolistic behaviors seen in both tech giants' cases.

### 3. Count III: Restraint of Trade (Sherman Act §1)

355. **Google Case**: The court found Google's agreements stifled competition.

356. **Microsoft Case**: The tying of Internet Explorer to Windows OS was a key example of restraining trade.

357. **Antitrust Class Action**: Like Google and Microsoft, the Wi-Fi Calling Class Action illustrates how the Defendants' contracts and conspiracies have significantly restrained trade, limiting consumer choices and inflating prices in the telecommunications market.

### 4. Count IV: Tying (Clayton Act §3)

358. **Google Case**: The court noted potential Clayton Act violations through exclusionary agreements.

359. **Microsoft Case**: Tying Internet Explorer to Windows OS was a central issue, leading to significant antitrust findings.

360. **Antitrust Class Action**: The tying practices in all three cases demonstrate significant anticompetitive effects. The class action case emphasizes how such practices have been extensively used by telecom giants to control emerging technologies.

### 5. Count V: Forced Sale (Clayton Act §3)

361. **Google Case**: The court noted the impact of Google's revenue-sharing agreements in entrenching its monopoly.

362. **Microsoft Case**: While forced sale was not a primary focus, Microsoft's bundling practices echoed similar tactics.

363.   **Antitrust Class Action**: The class action case's focus on forced sales through bundling mirrors the tactics seen in Google's and Microsoft's cases, underscoring the coercive strategies used to maintain market control.

### 6. Count VI: Price Fixing (Clayton Act §2)

364.   **Google Case**: The court addressed Google's ability to raise prices due to its monopoly.

365.   **Microsoft Case**: Price manipulation was a concern, though not the central issue.

366.   **Antitrust Class Action**: Price-fixing concerns in the class action case resonate with issues in Google's case, highlighting the broader impacts of monopolistic control on pricing within the telecommunications sector.

### 7. Count VII: Predatory Pricing (Clayton Act §2)

367.   **Google Case**: The court did not explicitly address predatory pricing.

368.   **Microsoft Case**: Predatory practices were scrutinized, particularly regarding market dominance.

369.   **Antitrust Class Action**: The class action case's emphasis on predatory pricing reflects aggressive strategies to eliminate competition, a tactic also scrutinized in Microsoft's case, highlighting the broader implications for market competition.

### 8. Conclusion

370.   The comparative analysis between this Antitrust Class Action, United States v. Google LLC, and United States v. Microsoft Corp. reveals a comprehensive approach to addressing monopolistic practices across different industries. This Antitrust Class Action, with its extensive scope, highlights a more complex set of antitrust violations that span multiple sections of both the Sherman and Clayton Acts. Unlike the Google and Microsoft cases, which primarily focused on Sherman Act violations, the class action case addresses a wider array of anticompetitive practices, including exclusive dealing, tying, and price fixing. This suggests a more pervasive set of

monopolistic practices within the telecommunications industry.

## DEMAND FOR JURY TRIAL

371.    Under Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38(a), Plaintiffs demand

a trial by jury on all issues so triable.

## PROPOSED CLASS RESTITUTION PLAN

372.    The Defendants—AT&T, Verizon, T-Mobile, and Deutsche Telekom—are collectively

extracting $268.56 billion annually from 373 million major carrier subscribers. Despite their

massive yearly revenue, these companies continue to deny consumers the option of more

affordable standalone Wi-Fi calling and mobile data services. Instead, they compel customers to

purchase costly bundled services filled with unnecessary features. This practice not only unfairly

inflates consumer costs but also stifles competition in the market. The Defendants' actions reflect

a disregard for consumer choice and fairness, warranting urgent regulatory action to protect

consumers and restore competitive balance in the telecommunications industry.

### A.  Restitution Proposal Overview

373.    The Defendants' actions, including fraudulent misrepresentation, deceit, and lack of transparency,

have caused substantial damages to consumers over a five-year period. Below is a detailed

breakdown of the damages calculation and the proposed restitution plan.

#### 1.  Calculation of Annual Cost Per Subscriber

i.      Average Monthly Cost Per Subscriber: $50

ii.     Annual Cost Per Subscriber: $50 x 12 = $600

374. This represents the baseline average cost paid by each subscriber annually for their telecommunications services.

| | FY 2020 | FY 2021 | FY 2022 | FY 2023 |
|---|---|---|---|---|
| **Wireless Service Revenues** | | | | |
| Verizon | $65,410,000,000 | $68,469,000,000 | $74,354,000,000 | $76,730,000,000 |
| T-Mobile | $50,395,000,000 | $58,369,000,000 | $61,323,000,000 | $63,241,000,000 |
| AT&T | $72,564,000,000 | $78,254,000,000 | $81,780,000,000 | $83,982,000,000 |
| **Ending Annual Subscribers** | | | | |
| Verizon | 120,880,000 | 142,806,000 | 143,253,000 | 144,751,000 |
| T-Mobile | 102,064,000 | 108,719,000 | 113,598,000 | 114,500,000 |
| AT&T | 101,791,000 | 106,675,000 | 109,919,000 | 113,808,000 |
| **Total** | 324,735,000 | 358,200,000 | 366,770,000 | 373,059,000 |
| **Average Annual Subscribers** | | | | |
| Verizon | 120,286,000 | 131,843,000 | 143,029,500 | 144,002,000 |
| T-Mobile | 84,979,000 | 105,391,500 | 111,158,500 | 114,049,000 |
| AT&T | 100,847,000 | 104,233,000 | 108,297,000 | 111,863,500 |
| Total | 306,112,000 | 341,467,500 | 362,485,000 | 369,914,500 |
| **Avg. Monthly Wireless Revenue per Subscriber / Line** | | | | |
| Verizon | $45.32 | $43.28 | $43.32 | $44.40 |
| T-Mobile | $49.42 | $46.15 | $45.97 | $46.21 |
| AT&T | $59.96 | $62.56 | $62.93 | $62.56 |
| **Composition Amongst 3 Major Carriers** | | | | |
| Verizon | 39.29% | 38.61% | 39.46% | 38.93% |
| T-Mobile | 27.76% | 30.86% | 30.67% | 30.83% |
| AT&T | 32.94% | 30.53% | 29.88% | 30.24% |
| **Total** | 100.00% | 100.00% | 100.00% | 100.00% |
| **Weighted Average Plan Cost - 3 Major Carriers** | | | | |
| Verizon Share | $17.81 | $16.71 | $17.09 | $17.29 |
| T-Mobile Share | $13.72 | $14.24 | $14.10 | $14.25 |
| AT&T Share | $19.75 | $19.10 | $18.80 | $18.92 |
| **Weighted Average Plan Cost - 3 Major Carriers** | **$51.28** | **$50.05** | **$49.99** | **$50.45** |

### 2.  Additional Unjust Enrichment

i.  Additional Unjust Enrichment Per Month: $10

ii.  Additional Unjust Enrichment per Year: $120

iii.  Total Annual Impact Per Subscriber: $600 (annual cost) + $120 (unjust enrichment) = $720

375. The $120 represents the excess amount charged to subscribers due to the Defendants' anti-competitive practices.

### 3.  Total Impact Over Five Years

i.  Total Impact Over Five Years Per Subscriber: $720 x 5 = $3,600

376. This figure represents the cumulative financial impact on each subscriber over the five-year period due to the Defendants' actions.

#### 4. Proposed Restitution Plan

i. MANDATE a $144 annual bill reduction ($12 per month) for each affected subscriber for five consecutive years.

ii. Total Restitution Per Subscriber: $144 x 5 years = $720

377. Instead of demanding the payment of total cash damages upfront, the proposed restitution plan aims to provide a fair and sustainable remedy by reducing each affected subscriber's bill by $144 annually for five years. The TOTAL amount is intended to compensate subscribers for the overcharges, with a moderate and fair approach that balances the need for consumer relief with the financial stability of the Defendants.

#### 5. Basis for the Restitution Calculation

i. 20% of the $600 Annual Cost: $600 x 20% = $120 per year

ii. Total Restitution Over Five Years = $120 x 5 Years = $600

iii. Additional $120 for Unjust Enrichment: $600 + $120 = $720 Total Restitution per Subscriber. This restitution amount should be deemed to account for overcharges, plus the unjust enrichment, ensuring that the restitution is aligned with the Defendants' unjust gains.

iv. One Year of Restitution Paid Over Five Years: $720 ÷ 5 years = $144 Restitution per Year per Subscriber ($12 per Month per Subscriber).

### B. Nationwide Impact and Justification

378. Estimated Affected Subscribers: 373 million major carrier subscribers nationwide. Total Restitution Value: $144 per year per subscriber x 5 years x 373 million major carrier subscribers = <u>$268.56 billion</u>.

379. This figure represents the total amount of the proposed bill reductions across the entire subscriber

base over five years. It is a substantial but fair figure that reflects the magnitude of the damages without demanding an immediate cash outlay from the Defendants.

### C. Legal and Economic Rationale

380. This restitution plan, amounting to $268.56 billion over five years, is designed to ensure that the Defendants can continue to operate while providing fair compensation to affected consumers. The proposal allows the Defendants to meet their obligations through bill reductions rather than an immediate cash payment, which is more sustainable and less disruptive to their financial stability. The structured approach ensures that consumers are compensated fairly, while maintaining the financial health of the telecommunications industry.

381. The Court is urged to consider this reasonable and balanced approach to restitution, which aims to correct the Defendants' anti-competitive practices without causing undue financial strain. By mandating this restitution, the Court would set a precedent that protects consumer rights, fosters competition, and ensures accountability in the telecommunications market.

### D. Ensuring Fair Restitution and Market Stability

382. The proposed restitution plan of $144 per subscriber annually ($12 per month) over five years ($720 per subscriber), totaling $268.56 billion, is a fair and reasonable solution to address the damages caused by the Defendants. It ensures that consumers are compensated for the overcharges and that the Defendants continue to operate without facing an insurmountable financial burden. This approach aligns with market analysis, which suggests that such a structured restitution plan is more equitable and sustainable, providing a clear path forward benefitting both consumers and the telecommunications industry as a whole.

### E.   Comparison to Landmark Cases for the Antitrust Class Action

#### 1.   Payment Card Interchange Fee and Merchant Discount Antitrust Litigation:

383.   **Class Size**: Over 12 million merchants.

384.   **Settlement**: Approximately $6.24 billion.

385.   **Scale Comparison**: The current Antitrust Class Action, with a restitution demand of $268.56 billion, is over 43 times larger.

386.   **Type**: Antitrust litigation.

#### 2.   Tobacco Antitrust Litigation

387.   **Class Size**: Approximately 46 million tobacco consumers nationwide.

388.   **Settlement**: The tobacco industry settled for $206 billion over 25 years.

389.   **Scale Comparison**: The current Antitrust Class Action is nearly 1.3 times larger.

390.   **Type**: Antitrust litigation.

#### 3.   Visa and MasterCard Antitrust Litigation

391.   **Class Size**: Around 10 million cardholders.

392.   **Settlement**: Approximately $3 billion.

393.   **Scale Comparison**: The current Antitrust Class Action is an astounding 89.5 times larger.

394.   **Type**: Antitrust litigation.

### F.   A Call for a Landmark Judgment

395.   In light of the unprecedented scale, robust legal precedents, and global implications of this case, the Court is presented with a historic opportunity to redefine antitrust enforcement in the digital age.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, representing the class, pray for judgment against the Defendants, jointly and severally, as follows:

**I. Conduct Remedies**

1. **Injunctive Relief**: Issue an order enjoining Defendants from continuing their anticompetitive practices, including but not limited to illegal tying and bundling, exclusive dealing, price fixing, and predatory pricing strategies.

2. **Unbundling of Services**:

    1. **Wi-Fi Calling and Texting**: Mandate the Defendants to immediately unbundle compulsory Wi-Fi calling and texting services from cellular calling and texting services, ensuring consumers can independently choose either or both of these services.

    2. **Mobile Data Plans**: Mandate Defendants the Defendants to immediately unbundle compulsory mobile data plans from cellular calling and texting services, ensuring consumers can independently choose either or both of these services.

3. **Third-Party Interoperability**: Compel Defendants to facilitate third-party interoperability on native dialer and messaging applications for both Wi-Fi calling and mobile data services, fostering a competitive environment.

4. **Separate Service Purchase**: Ensure Defendants allow subscribers to purchase Wi-Fi calling, mobile data, and texting as separate services from other networks.

5. **Disclosure and Compensation**: Cease the offloading of cellular calls and data onto Wi-Fi networks without proper disclosure and compensation to subscribers, ensuring transparency and fairness.

## II. Monetary Damages

1. **Compensation for Financial Harm**: Award damages to the Plaintiffs for the harm suffered due to the monopolistic bundling of Wi-Fi calling and texting services and mobile data services with cellular calling and texting services, including direct financial losses and market impacts.

2. **Damages for Price Fixing**: Compensate the Plaintiffs for damages due to price fixing of Wi-Fi calling, mobile data, and texting services, including inflated costs and reduced service quality.

3. **Lost Opportunity and Value**: Award damages for the loss of opportunity to market and use standalone Wi-Fi calling and mobile data services, and for the resulting loss of value.

4. **Enhanced Damages**: Grant enhanced or treble damages as provided under 15 U.S.C. § 15a, and supplemental damages for any continuing post-verdict anticompetitive conduct until the entry of final judgment.

5. **Reimbursement of Legal Costs**: Order Defendants to cover all legal costs incurred by the Plaintiffs, ensuring full reimbursement for litigation expenses.

## III. Treble Damages

1. **Deterrence of Further Violations**: Award treble damages as stipulated in Section 4 of the Clayton Antitrust Act of 1914, codified at 15 U.S.C. § 15. This provision entitles Plaintiffs to recover three times the damages sustained, plus the cost of the suit, including reasonable attorney's fees.

## IV. Behavioral Remedies

1. **Facilitation of Competition**: Require Defendants to enable third-party interoperability on native dialers of smartphones for both Wi-Fi calling and mobile data services, promoting a competitive marketplace.

2. **Restoration of Competitive Conditions**: Implement injunctive relief to restore competitive conditions in the relevant markets affected by the Defendants' unlawful conduct.

3. **Structural Remedies**: Consider structural relief, which may include the divestiture of certain business units or assets, to promote fair competition.

## V. Restitution

1. **Monetary Restitution**: Award restitution to the plaintiffs for harm, loss, and damage, including enhanced or treble damages as provided by 15 U.S.C. § 15a.

2. **Disgorgement of Profits**: Mandate restitution after an accounting and disgorgement of profits unfairly earned due to misrepresentations that Wi-Fi calling and mobile data services are "free," resulting in unjust enrichment.

3. **Restitution for Unjust Enrichment**: ORDER the Defendants to implement the proposed class restitution plan and ENSURE the Defendants' compliance with this restitution plan through appropriate monitoring and enforcement mechanisms.

4. **Restitution Plan Implementation**: MANDATE a $144 annual bill reduction for each affected subscriber for five consecutive years.

5. **Refunds for Overcharges**: MANDATE refunds to subscribers for any overcharges on bundled services, calculated based on the difference between the standalone cost of Wi-Fi calling and texting service or mobile data services, and the bundled price.

6. Debt Relief: MANDATE a debt relief program for affected subscribers who were burdened by excessive charges for bundled services, providing partial or full forgiveness of outstanding balances attributable to these charges.

## VI. Criminal and Civil Penalties

1. **Imposition of Penalties**: Order appropriate authorities to impose criminal and civil penalties on Defendants for antitrust and anticompetitive violations.

2. **Declaration of Violations**: Declare that Defendants, in their capacity as board members, officers, and employees, have committed criminal violations of the Clayton and Sherman Acts, 15 U.S.C. §§ 14 and 1.

## VII. Damages for Willful Antitrust Technology Misuse

1. **Compensation for Technology Misuse**: Compensate for harm, loss, and damage resulting from Defendants' breach of antitrust laws and misuse of Wi-Fi calling and texting technology and know-how.

2. **Disgorgement of Profits**: Disgorge profits obtained from the misuse of Wi-Fi calling and texting technology and know-how.

## VIII. Extending the Damages Period

1. **Award Extended Damages**: Award damages for the entire period of Defendants' fraudulent misrepresentation, deceit, and misleading conduct related to Wi-Fi calling services, extending beyond the standard 4-year statute of limitations, due to:

   - The continuing nature of the Defendants' violations;
   - The active concealment of the true costs and nature of Wi-Fi calling services; and
   - The delayed discovery of the fraudulent conduct by consumers and shareholders.

## IX. Other Relief

1. **Prejudgment and Post-Judgment Interest**: Award prejudgment and post-judgment interest on all damages awarded, at the highest rate allowable by law, to ensure full compensation for losses.

2. **Additional Remedies**: Grant any other and further relief that the Court deems just and proper to address the full scope of harm and rectify the anticompetitive and fraudulent practices of the Defendants.

3. **Appointment of a Special Master**: Appoint a Special Master to oversee the implementation of conduct remedies and ensure compliance with the Court's orders.

4. **Periodic Audits and Compliance Reporting**: Require Defendants to submit to periodic audits and compliance reporting by an independent third party approved by the Court.

5. **Consumer Education Programs**: Mandate the funding and implementation of consumer education programs to inform consumers about their rights and the true nature of Wi-Fi calling services.

6. **Public Acknowledgment**: Require Defendants to issue public notices, approved by the Court, acknowledging their anticompetitive conduct and detailing the remedies being implemented.

7. **Permanent Injunction**: Permanently enjoin Defendants from engaging in any future conduct that violates federal or state antitrust laws.

8. **Attorney's Fees**: Plaintiffs is seeking reimbursement for its attorneys' fees and costs associated with pursuing this case.

## CLOSING

396. This case against AT&T, T-Mobile, Deutsche Telekom AG (Deutsche Telekom is the majority shareholder of T-Mobile US), and Verizon centers on dismantling their deeply entrenched, anticompetitive business practices. At the heart of this case lies the forced bundling of Wi-Fi calling with cellular services and mobile data with texting, which has perpetuated an unfair market dominance. The Defendants' practices have:

*a)* Suppressed competition by blocking standalone Wi-Fi calling and mobile data services.

*b)* Inflated prices through mandatory bundled services, often at the consumer's expense.

*c)* Hindered market innovation by barring new competitors.

*d)* Misled consumers about the true costs and benefits of these services.

397. Unbundling these services is crucial for:

*a)* Empowering consumer choice by allowing tailored service selections.

*b)* Encouraging market competition, leading to lower prices and innovative offerings.

*c)* Promoting transparency in pricing, giving consumers clear cost insights.

    *d)*  Ensuring fair infrastructure use, particularly in the offloading of cellular traffic onto Wi-Fi networks.

398.    Plaintiffs request to the following action by the Court to provide remedy for these issues:

    *a)*  Issue injunctive relief to stop anticompetitive bundling.

    *b)*  Mandate the unbundling of Wi-Fi calling and mobile data from cellular services.

    *c)*  Require interoperability to allow third-party service integration.

    *d)*  Consider structural remedies, including potential divestitures, to restore competition.

    *e)*  Award damages to compensate for harm and deter future violations.

    *f)*  Ensure ongoing oversight to monitor compliance and maintain fair market practices.

399.    This case is not just about rectifying past wrongs but about setting a precedent that will foster a competitive, innovative, and consumer-focused telecommunications industry. The Court's decision has the potential to reshape the market, ensuring that it operates on principles of fairness, innovation, and transparency, ultimately benefiting consumers and encouraging technological progress. The American people and telecommunications subscribers worldwide are watching with hope.

Dated: August 17, 2024

Respectfully submitted,

<u>/s/ Travis Pittman</u>
Travis Pittman (D.C. Bar No. 1016894)
Local Counsel for Plaintiff
HOLMES, PITTMAN & HARAGUCHI, LLP
1140 3rd St. NE
Washington, DC 20002
(202) 329-3558
jtpittman@hphattorneys.com

Sean Parmenter (CA Bar No. 233144)
Lead Counsel for Plaintiff
PARMENTER INTELLECTUAL
PROPERTY LAW, PLLC
1401 21st St, Suite #10724
Sacramento, CA 95811
(925) 482-6515
sean@parmenterip.com

ATTORNEYS FOR PLAINTIFFS